## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| RUM POINT RECOVERY LLC and NORTH SIDE RECOVERY LLC <br><br><br> Plaintiffs, <br><br> v. <br><br><br> VISA INC.; VISA U.S.A. INC.; VISA INTERNATIONAL SERVICE ASSOCIATION; MASTERCARD INCORPORATED; and MASTERCARD INTERNATIONAL INCORPORATED <br><br> Defendants. | **COMPLAINT** <br><br> No. 05-MD-01720(MKB) (VMS) |

Plaintiffs Rum Point Recovery LLC ("Rum Point") as successor-in-interest to Great Wolf Resorts Holdings, Inc. and its subsidiaries and affiliates ("Great Wolf") and North Side Recovery LLC ("North Side") as successor-in-interest to Hastings Entertainment, Inc. and its subsidiaries and affiliates, and SP Images Inc. (Collectively "Hastings"), by and through their undersigned attorneys, alleges as follows:

### INTRODUCTION

1.      Rum Point and North Side, as the successors in interest to Great Wolf's and Hastings' claims in this action, respectfully, bring this action under federal and state antitrust laws in order to recover damages and obtain injunctive relief for past and ongoing anticompetitive conduct by the two electronic-payment cartels in the United States:  Visa and Mastercard.  These cartels' twin conspiracies and other anticompetitive conduct have already injured merchants and consumers on a magnitude of hundreds of billions of dollars during the Damages Period (January

1, 2004, through the date of judgment), and these cartels' anticompetitive conduct will cost merchants and consumers untold more billions if that conduct is not enjoined.

2.        When the Damages Period began in 2004, Visa and Mastercard were the instrumentalities that effectuated the massive conspiracies among each association's owner/member banks that had agreed to unreasonably, and illegally, restrain competition.  Prior to their corporate restructurings in 2006 and 2008, respectively, Mastercard and Visa were each organized as a membership corporation, the owners and members of which were virtually all of the competing banks that issued General Purpose Payment Cards to consumers and/or that signed merchants to accept such cards.  Each membership corporation was governed by bank executives selected from Visa's and Mastercard's owner/member banks.  As the Second Circuit held, Visa and Mastercard were "not single entities; they [were] consortiums of competitors . . . owned and effectively operated by some 20,000 banks, which compete with one another in the issuance of payment cards and the acquiring of merchants' transactions," *i.e.*, banks that issue General Purpose Payment Cards.  *United States v. Visa U.S.A. Inc.*, 344 F.3d 229, 242 (2d Cir. 2003).  These competitors sat together on Visa's and Mastercard's governing boards of directors, and agreed upon the rules that would restrain competition among them.

3.        One of the two principal sets of rules restraining competition, to which these banks have agreed throughout the Damages Period, is the "Honor All Issuers" rule.  Pursuant to the networks' respective Honor All Issuers rules, each of Visa's and Mastercard's owner/member banks have agreed as follows:  Any merchant that accepts any one bank's General Purpose Credit (or Debit) Cards issued over that network <u>must</u> accept all other banks' General Purpose Credit (or Debit) Cards that carry the brand of that network.  The banks have also agreed to abide by additional rules that have restrained them from competing against each other for preferential

treatment by merchants at the point of sale. Such preferential treatment would have resulted in lower prices for both merchants and consumers, including by giving discounts or other benefits to preferred cardholders at the point of sale. Through such rules, the competing banks that issued Visa and Mastercard General Purpose Payment Cards have agreed not to compete with one another for merchant acceptance of those cards. Pursuant to the networks' respective default "Interchange Fee" rules, those competing banks also agreed to fix the Interchange Fees that merchants paid the banks for acceptance of those cards. That default Interchange Fee rule is the second principal restraint of competition to which these competing banks have agreed throughout the Damages Period.

4.  The conspiracies began when Visa and Mastercard were structured as "consortiums of competitors," and they continued unabated after Visa and Mastercard assumed their new corporate forms. In fact, Visa, Mastercard and their affiliated banks designed their new corporate forms to create veneers of separate independent entities that superficially masked the perpetuation of their anticompetitive cartels. The competing banks sitting on Visa's and Mastercard's boards ratified the corporate reorganizations on the anticompetitive conditions that all banks continue to adhere to their agreements not to compete, and that Visa and Mastercard maintain the default Interchange Fee rules that support the price-fixing conspiracies. The underlying conspiracies have continued, and Visa's and Mastercard's substantial market power has increased.

5.  The Visa Defendants engaged in a conspiracy in restraint of trade in the General Purpose Payment Card markets, and Visa has monopolized the General Purpose Debit Card market, in the United States. The Visa Defendants' principal unlawful anticompetitive conduct was an agreement not to compete for merchant acceptance of their Visa General Purpose Payment Cards. As part of this illegal scheme, the Visa Defendants agreed to restrain competition, including

by blocking differentiation of Issuers' payment products to cardholders through direct agreements with merchants, and to collusively fix the prices that merchants paid to accept Visa General Purpose Payment Cards at supracompetitive levels.  In May 2013, Visa CEO Charles W. Scharf admitted that Visa's rules **"stood in the way of [banks] working together to do something positive for the merchant."**  Visa's rules equally barred the banks from doing "something positive" for cardholders, who would have benefitted from banks competing for their business by differentiating their offerings, including by offering discounts and other benefits at the point of sale, through direct agreements with merchants.  That unlawful agreement continues to this day.

6.    The Mastercard Defendants also engaged in a conspiracy in restraint of trade in the General Purpose Payment Card markets in the United States.  The Mastercard Defendants' principal unlawful anticompetitive conduct was an agreement not to compete for merchant acceptance of their Mastercard General Purpose Payment Cards.  As part of this illegal scheme, the Mastercard Defendants agreed to restrain competition, including by blocking differentiation of Issuers' payment products to cardholders through direct agreements with merchants, and to collusively fix the prices that merchants paid to accept Mastercard General Purpose Payment Cards at supracompetitive levels.  That unlawful agreement continues to this day.

7.    The Defendants' agreements not to compete and to fix prices ensured that Visa/Mastercard issuers enjoyed, and continue to enjoy, supracompetitive profits.  Such supracompetitive profits have kept the banks faithful to the Visa and Mastercard cartels, and thus have maintained the cartels' discipline and market power.  Starting in 2004 and extending throughout the Damages Period, the largest Visa and Mastercard issuers examined how they could differentiate their competing cards from one another in a way that would have directly benefitted

both cardholders and merchants. These banks recognized that it was in their individual economic self-interest to break free.

8.    Yet, Visa and Mastercard issuers did not do that. Instead, banks continued and still continue to adhere to their core agreements not to compete (through the Honor All Issuers rules) and to fix prices (through the default Interchange Fee rules), because they earn more by colluding than by competing in ways that would have benefitted their cardholders and merchants. Those horizontal agreements have thus harmed both merchants, who pay supracompetitive Interchange Fees, and cardholders, who both pay higher prices and receive card services of diminished quality and choice.

9.    The cartels' supracompetitive profits also have lured additional banks into joining the conspiracies, which has further maintained and enhanced the cartels' substantial market power. The Honor All Issuers and default Interchange Fee rules have thus been both the glue binding Visa's and Mastercard's twin cartels with their owner/member banks, and the means through which Visa and Mastercard have expanded those cartels to achieve substantial market power in the General Purpose Payment Card markets, power they wielded throughout the Damages Period and power they continue to wield to this day.

10.    The Defendants' agreements not to compete and price-fixing schemes are naked restraints of trade and *per se* violations of Section 1 of the Sherman Act.

11.    Even if the Defendants' conduct is analyzed under the rule of reason, the substantial harm to competition caused by the cartels violates Section 1 of the Sherman Act as an unreasonable restraint of trade. None of the Defendants' anticompetitive rules and practices are reasonably necessary for the functioning of General Purpose Payment Card Networks. Any benefits that Defendants claim are achieved by these restraints of trade can be accomplished by means that are

less destructive and harmful to competition.  Even if Defendants' restraints have any procompetitive benefit, their anticompetitive effects—massive overcharges to merchants and their customers, higher prices and card services of diminished quality and choice for cardholders, and maintenance of substantial market power—vastly outweigh any such benefit.

12.    The anticompetitive harm to merchants and consumers from Defendants' price fixing and other anticompetitive conduct has been staggering.  During the Damages Period, Defendants imposed Interchange Fees estimated at more than $450 billion on merchants and consumers in the United States.  Defendants' anticompetitive conduct has also injured competition in the General Purpose Payment Card markets by depriving market participants of lower prices as well as innovative new payment options and cost-saving approaches (*e.g*., to reduce fraud) that would have substantially benefitted U.S. merchants and consumers.

## JURISDICTION AND VENUE

13.    Plaintiffs' Complaint (hereinafter "Complaint") is filed under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and/or restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15.  The Court has jurisdiction over the federal antitrust law claims alleged herein under 28 U.S.C. §§ 1331, 1337, 2201, and 2202.  The Court has jurisdiction over state antitrust and unfair competition law claims alleged herein under 28 U.S.C. § 1367.

14.    Defendants transact business and are found in this District.  The interstate trade and commerce involved and affected by the alleged violations of antitrust law occurred, in part, within this District.  The acts complained of have had, and will have, substantial anticompetitive effects in the District.  Venue is proper in this District under 28 U.S.C. § 1391 and 15 U.S.C. §§ 15, 22, and 26.

## DEFINITIONS

15.    The following terms are used in this Complaint:

a.    "Acquirer" means a bank or other financial institution that has been authorized by a General Purpose Payment Card Network to enter into agreements with merchants that enable those merchants to accept General Purpose Payment Cards for the purchase of goods and services.  Acquirers authorized by the Visa and Mastercard General Purpose Payment Card Networks to acquire Visa- and/or Mastercard-branded General Purpose Payment Card transactions are members or agents of those networks.

b.    "Charge Card" (also referred to as a "Travel and Entertainment Card" or "T&E card") is a General Purpose Credit Card for which the cardholder is required, under most circumstances, to pay the card balance in full each month.  Diners Club cards and traditional American Express Green, Gold, Platinum and Centurion (Black) cards without preset spending limits are examples of Charge Cards.  Charge Cards generate revenue for the Issuer primarily from fees charged to merchants and from annual fees charged to cardholders.  In contrast, credit cards generate Issuer revenue primarily from interest charges and fees from cardholders who revolve and carry a monthly balance.

c.    "Damages Period" means the period from January 1, 2004, to the date of judgment in this action.

d.    "Dual-Message" transaction means an electronic payment transaction in which the authorization request and financial settlement are handled in two separate messages, and, in the U.S. market, is predominantly authenticated by cardholder signature.

e.    "General Purpose Credit Card" during the Damages Period means a plastic card or other physical form factor, such as a key fob, provided by an Issuer that allows cardholders to pay for goods and services at a large number of diverse merchants by accessing a line of credit extended to the cardholder by the Issuer.  Examples of General Purpose Credit Cards are the Visa and Mastercard credit cards, as well as certain Visa or Mastercard corporate cards, the Discover credit card issued by Discover Financial Services, and the Optima and Blue-type credit cards issued by American Express.  General Purpose Credit Cards also include Charge Cards such as the traditional American Express card that require payment at the end of a billing cycle.

f.    "General Purpose Credit Card Network Services" means the services and infrastructure that a network and its members provide to merchants through which payment transactions using General Purpose Credit Cards are conducted, including authorization, clearance, and settlement.

g.    "General Purpose Debit Card" during the Damages Period means a plastic card or other physical form factor, such as a key fob, provided by an Issuer that allows cardholders to pay for goods and services at a large number of diverse merchants by accessing an asset account, typically the cardholder's demand deposit account ("DDA"), at a bank or other financial institution.  Visa's Signature Debit Card program (the "Visa Check Card") and Mastercard's Signature Debit Card program (sometimes referred to as "Debit Mastercard") are General Purpose Debit Cards, as are PIN Debit Cards authorized over Visa's Interlink and Mastercard's Maestro networks.  General Purpose Debit Cards also include prepaid cards, which access asset accounts other than the cardholder's DDA. Examples include, but are not limited to, payroll cards and cards associated with a flexible-spending account, health-reimbursement arrangement, or health-savings account.

h.    "General Purpose Debit Card Network Services" means the services and infrastructure that a network and its members provide to merchants through which payment transactions using General Purpose Debit Cards are conducted, including authorization, clearance, and settlement.

i.    "General Purpose Payment Card" means a General Purpose Credit Card or a General Purpose Debit Card.

j.    "General Purpose Payment Card Network" means an electronic payment system used to accept, transmit or process transactions made by General Purpose Payment Cards for money, goods or services and to transfer information and funds among Issuers, Acquirers, merchants and users of General Purpose Payment Cards.  Both Visa and Mastercard operate General Purpose Payment Card Networks.

k.    "Honor All Issuers" rules are the "Honor All Cards" rules of Visa and Mastercard that require any merchant that accepts Visa- or Mastercard-branded General Purpose Credit Cards to accept all such General Purpose Credit Cards that carry the brand of that network, and the rules of Visa and Mastercard that require any merchant that accepts Visa- or Mastercard-branded General Purpose Debit Cards to accept all such General Purpose Debit Cards that carry the brand of the respective network.

l.    "Interchange Fees" are fees or rates fixed by Visa or Mastercard and their owner/member banks that are paid to Issuers by merchants in conjunction with transactions in which Visa or Mastercard General Purpose Payment Cards are used as a means of payment for purchases of goods and services. Interchange Fees are deducted by an Issuer from the funds owed to a merchant prior to the settlement of a Visa or Mastercard General Purpose Payment Card transaction.

m.  "Issuer" means a bank or other financial institution that issues General Purpose Payment Cards to consumers (including business employees) to pay for goods and services at merchant locations. Issuers authorized by the Visa and Mastercard General Purpose Payment Card Networks to issue Visa- and/or Mastercard-branded General Purpose Payment Cards are members of those networks.

n.  "Mastercard Defendants" refer to Mastercard Incorporated and Mastercard International Incorporated.

o.  "PIN Debit Card" means a General Purpose Debit Card with which the cardholder authorizes a withdrawal from his or her bank account by swiping his or her card at the point of sale and entering a personal identification number ("PIN"). PIN Debit Card networks grew out of regional ATM networks and PIN Debit Card transactions are processed differently than Signature Debit Card transactions. Examples of PIN Debit Card networks include Visa's Interlink network, Mastercard's Maestro network, FIS's NYCE network, and First Data Corporation's STAR network.

p.  "Premium Payment Card" means a General Purpose Credit Card that carries a higher Interchange Fee than standard General Purpose Credit Cards and is required by a network to provide a certain level of rewards or incentives to the cardholder. The "Visa Signature Preferred Card" product and "World Mastercard Card" product are examples of Premium Payment Cards.

q.  "Signature Debit Card" means a General Purpose Debit Card with which the cardholder authorizes a withdrawal from his or her bank account, usually by presenting the card at the point of sale and signing a receipt or point-of-sale terminal. Signature Debit Card transactions are processed in the same way as General Purpose Credit Card transactions. Examples of Signature Debit Cards include the Visa Check Card product and the Debit Mastercard product.

r.  "Single-Message" transaction means an electronic payment transaction that processes the authorization request/response and financial settlement in one message, and, in the U.S. market, is predominantly authenticated by cardholder PIN.

s.  "Visa Defendants" refer to Visa Inc., Visa U.S.A. Inc., and Visa International Service Association.

## PARTIES

### A.    Rum Point

16.    Rum Point is the successor-in-interest to Great Wolf with respect to the claims asserted in this action.  Rum Point is a limited liability company established under Delaware law, with its principal place of business at 9 West 57th Street, New York, New York.

17.    On or about July 23, 2019, Rum Point purchased Great Wolf's claims asserted in this action, which do not include Great Wolf's claims concerning the Grand Mound Resort in Centralia, Washington.

18.    During the Damages Period, Great Wolf was the entity that maintained the processing relationship for all Visa and Mastercard transactions accepted at Great Wolf's locations and those of all of its subsidiaries and affiliates.  This circumstance does not, however, apply to the Grand Mound Resort in Centralia, Washington.

19.    Rum Point is seeking to, among other things, recover the damages incurred by Great Wolf as a result of the conduct detailed in this Complaint.

### B.    North Side

20.    North Side is the successor-in-interest to Hastings with respect to the claims asserted in this action. North Side is a limited liability company established under Delaware law, with its principal place of business at 9 West 57th Street, New York, New York.

21.    On January 15, 2019, North Side purchased Hastings' claims asserted in this action.

22.    During the Damages Period, Hastings was the entity that maintained the processing relationship for all Visa and Mastercard transactions accepted at Hastings' locations and those of all of its subsidiaries and affiliates.

23.    North Side is seeking to, among other things, recover the damages incurred by Hastings as a result of the conduct detailed in this Complaint.

### C.    Visa and Mastercard

24.    Prior to the Visa IPO, Defendant Visa U.S.A. Inc. ("Visa U.S.A.") operated as a nonstock, nonassessable Delaware membership corporation with its principal place of business in Foster City, California.  Its owner/members included approximately 14,000 banks.

25.    Prior to the Visa IPO, Defendant Visa International Service Association ("Visa International") operated as a nonstock, nonassessable Delaware membership corporation with its principal place of business in Foster City, California.  Its owner/members included approximately 21,000 banks.

26.    Prior to the Visa IPO, Visa U.S.A. and Visa International were each governed by a board of directors (and Visa International had regional boards of directors for each of its geographical regions) comprised of bank executives selected from their owner/member banks. Visa U.S.A. also was a regional group member of Visa International.

27.    Visa U.S.A. and Visa International, as well as other Visa entities not named as defendants in this Complaint, conducted a number of corporate restructurings in 2007 and 2008 to combine several previously independent corporate entities into Defendant Visa Inc.  On March 19, 2008, Visa Inc. conducted an initial public offering through which it offered ownership shares to the general public and also issued ownership shares to its owner/member banks.  As a result, Visa Inc. became and operates today as a publicly-traded Delaware corporation, with its principal place of business in Foster City, California.  Upon the restructuring, Visa U.S.A. and Visa International became wholly owned subsidiaries of Visa Inc. and they continue to operate as such today.  Visa Inc., Visa U.S.A., and Visa International are collectively referred to herein as "Visa."

28.    Visa operates General Purpose Payment Card Networks and did so throughout the Damages Period.

29.    Prior to the Mastercard IPO, Defendant Mastercard Incorporated was a private, SEC-registered share company, organized under the laws of Delaware with its principal place of business in Purchase, New York.  Defendant Mastercard International Incorporated, a wholly owned subsidiary of Mastercard Incorporated with its principal place of business also in Purchase, New York, was a Delaware membership corporation that, prior to the Mastercard IPO, consisted of more than 23,000 owner/member banks worldwide and was the principal operating subsidiary of Mastercard Incorporated.

30.    Prior to the Mastercard IPO, Mastercard Incorporated and Mastercard International Incorporated were governed by a global board of directors, as well as regional boards of directors for each of their geographical regions, that were comprised of bank executives selected from their owner/member banks.

31.    On May 25, 2006, Mastercard Incorporated and Mastercard International Incorporated conducted an initial public offering and entered into several related agreements to offer ownership shares to the general public and to issue ownership shares to Mastercard's owner/member banks.  As a result, Mastercard Incorporated became and operates today as a publicly-traded Delaware corporation with its principal place of business in Purchase, New York. Upon the restructuring and continuing to this day, Mastercard International Incorporated has remained Mastercard Incorporated's principal operating subsidiary with its principal place of business also in Purchase, New York, and doing business as Mastercard Worldwide.  Mastercard Incorporated and Mastercard International Incorporated (and Mastercard Worldwide) are collectively referred to herein as "Mastercard."

32.    Mastercard operates General Purpose Payment Card Networks and did so throughout the Damages Period.

## FACTUAL ALLEGATIONS

### A.    Defendants' Cartels

33.    Defendants have created and maintained two separate cartels that implemented their agreements not to compete and to fix prices.  One conspiracy was perpetrated by the Visa Defendants; the other was perpetrated by the Mastercard Defendants.  Both conspiracies are ongoing.

34.    The pillars of each of these conspiracies are Visa's and Mastercard's Honor All Issuers rules.  Pursuant to these rules, each network's owner/member banks have agreed that any merchant that accepts any one bank's General Purpose Credit (or Debit) Cards issued over that network <u>must</u> accept all other banks' General Purpose Credit (or Debit) Cards that carry the brand of that network.  These "all or nothing" rules thereby constitute agreements among the banks not to compete for merchants' acceptance of their General Purpose Credit (or Debit) Cards, including through direct agreements with merchants that would have enabled differentiation of their products at the point of sale.

35.    To reinforce their agreements not to compete for merchant acceptance, each network's issuing banks have colluded to fix the Interchange Fees they charge merchants on every transaction through the default Interchange Fee rules.  This has prevented merchants from realizing the price-reducing benefits of issuers competing on price, which would have occurred in a competitive market.  Instead, merchants accepting either Visa or Mastercard General Purpose Payment Cards pay the same Interchange Fee on a given transaction regardless of which issuer is involved.  There is no competition.  Within each conspiracy, issuers charge merchants exactly the same inflated prices that are the products of the banks' collusion.  While these banks compete in some respects for cardholders, they do not compete on the basis of differentiating their products

for cardholders at the point of sale through direct agreements with merchants or on the Interchange Fees that merchants pay to accept their Visa and Mastercard General Purpose Payment Cards.

36.     Visa and Mastercard are the enterprises by which competing banks implement and effectuate their agreements not to compete and to fix prices.  These schemes rely on rules—such as the Honor All Issuers rules, default Interchange Fee rules, and other rules and policies that establish mechanisms for monitoring and enforcing these price-fixing schemes—that bind all Visa and Mastercard issuers and Acquirers.

37.     In addition to inflicting direct anticompetitive harm on merchants and cardholders with these conspiracies to fix prices and otherwise restrain competition, Defendants also have used them to acquire and maintain their substantial market power.  Specifically, Visa and Mastercard used these supracompetitive Interchange Fees as an incentive for Issuers (who receive the Interchange Fees paid by merchants) to issue Visa and Mastercard General Purpose Payment Cards.  Using price fixing to induce Issuers to join their cartels, Visa and Mastercard acquired sufficient market power in the General Purpose Payment Card markets such that most merchants were compelled to accept their cards for payment.  Moreover, once a merchant started accepting Visa's and Mastercard's General Purpose Payment Cards for payment, it was virtually impossible to stop accepting them.  Once Visa and Mastercard acquired substantial market power over merchants, they maintained it by forcing merchants to pay ever higher Interchange Fees to continue to fund these price-fixing schemes and thereby perpetually maintain and enhance their cartels' market power through the present day.

38.     Although Visa and Mastercard initially focused their anticompetitive conduct on General Purpose Credit Cards, once they achieved substantial market power in the General Purpose Credit Card market, they leveraged it to achieve substantial market power in the General

Purpose Debit Card market by forcing merchants to accept Defendants' Signature Debit Card transactions as a condition of accepting Defendants' dominant General Purpose Credit Card transactions and by engaging in a variety of other exclusionary conduct.

39.     As the natural and intended consequences of their anticompetitive conduct, Defendants were able to set both General Purpose Credit Card and Debit Card Interchange Fees at supracompetitive levels.  Defendants' anticompetitive conduct generated more than $450 billion in Interchange Fees for Issuers during the Damages Period—fees paid by merchants and their customers.  Merchants and their customers paid these anticompetitive fees throughout the Damages Period and they continue to pay them to this day.

40.     Defendants' anticompetitive conduct during the Damages Period was not reasonably necessary to operate their General Purpose Payment Card Networks.  In numerous instances, banks examined ways to differentiate their own cards from their competitors' at the point of sale through arrangements with merchants that would have benefitted their cardholders.  Even though such differentiation, *i.e.*, competition, was in the banks' individual interests, they did not engage in such competition because it was prohibited by Visa's and Mastercard's rules including, most notably, the Honor All Issuers rules.  That shows that the Honor All Issuers rules and the supporting rules that barred any differentiation at the point of sale were not necessary for banks to issue payment cards.  Domestic and international examples have also demonstrated that Interchange Fees are economically unnecessary to encourage Issuers to issue General Purpose Payment Cards or for these payment systems to function.  *A fortiori*, issuers' collusively-fixed, supracompetitive Interchange Fees are unjustifiable.

**1.    During the Damages Period, Visa and Mastercard facilitated horizontal conspiracies of their owner/member banks.**

41.    Visa and Mastercard owner/member banks conspired to control every aspect of Visa's and Mastercard's business.    Such collective control was used to implement the owner/member banks' agreements not to compete for merchant acceptance of General Purpose Payment Cards—which foreclosed banks from entering into direct agreements with merchants to differentiate their products—and the associated agreements to fix the prices of Interchange Fees for Visa and Mastercard General Purpose Payment Card transactions.    At the beginning of the Damages Period, the Visa and Mastercard owner/member banks ratified the default Interchange Fee schedules that were recommended by staff and consultants of Visa and Mastercard. Throughout the Damages Period, the conspiracies broadened as more banks joined Visa and Mastercard and agreed to abide by the agreements not to compete and to fix prices.    The conspiracies also broadened during that time period when the banks added new high-Interchange-Fee products—such as the Visa Signature and Signature Preferred Cards and the World and World Elite Mastercard Cards—to the universe of Visa and Mastercard products that were subject to the conspiracies.

42.    In a decision affirming the condemnation of other exclusionary rules of Visa and Mastercard, the Second Circuit held in 2003 that Visa and Mastercard:

> *are not single entities; they are consortiums of competitors.  They are owned and effectively operated by some 20,000 banks, which compete with one another in the issuance of payment cards and the acquiring of merchants' transactions.  These 20,000 banks set the policies of Visa U.S.A. and Mastercard.  These competitors have agreed to abide by a restrictive exclusivity provision . . . <u>The restrictive provision is a horizontal restraint adopted by 20,000 competitors</u>.*

*United States v. Visa U.S.A. Inc.*, 344 F.3d at 242 (emphasis added).  Like those restrictive provisions, the anticompetitive conduct by Visa and Mastercard establishing the agreements not

to compete and price-fixing schemes were the products of conspiracies among competing Issuers—conspiracies that continue to this day.

### 2. The Honor All Issuers rules constitute unjustifiable horizontal agreements not to compete on price

43.    In order to eliminate any incentive for Issuers to compete for merchant acceptance based on price, as they would have done in a competitive market, Visa's and Mastercard's governing boards of directors approved the Honor All Issuers rules.

44.    The Honor All Issuers rules require a merchant to accept <u>all</u> of a network's Issuers' General Purpose Credit (or Debit) Cards bearing the network's brand if that merchant wants to accept any single Issuer's General Purpose Credit (or Debit) Cards bearing the network's brand, regardless of the Issuer.[1]  Visa and Mastercard also maintain related rules that prohibit merchants from steering consumers from using one Issuer's Visa or Mastercard General Purpose Payment Cards to using General Purpose Payment Cards issued by other Issuers.

45.    These "all or nothing" rules support Defendants' cartels in the following manner. By forcing a merchant to accept all General Purpose Credit (or Debit) Cards bearing the network's brand, while barring merchants from steering by Issuer, Issuers need not worry about losing business to a lower-cost competitor because all cards issued by every Issuer must be accepted at the default Interchange Fee rates.  Thus, a merchant that must accept a Visa Signature Preferred Card transaction, which bears an Interchange Fee ranging from 2.10% to 2.95% (plus $0.10), cannot attempt to steer consumers to cheaper payment cards or even to cheaper Visa (or

---

[1] *See, e.g.*, Visa Rule 5.2.B (Honoring Cards), Visa U.S.A. Inc. Operating Regulations, Volume 1—General Rules (Nov. 15, 2008); Visa Rule 1.5.4.5 (Honor All Cards – US Region), Visa Core Rules and Visa Product and Service Rules (Apr. 16, 2016); Mastercard Rules 5.6.1 (Honor All Cards) and 11.5C.2 (U.S. Region Variances to Global Rules) (including 11.5C.2.2 (Honor All Debit Mastercard Cards) and 11.5C.2.3 (Honor All Other Mastercard Cards)), Mastercard Rules (Oct. 2008); Mastercard Rule 5.10.1 (Honor All Cards), Ch. 15—United States Region, Mastercard Rules (July 7, 2016).

Mastercard) standard General Purpose Credit Cards, for which the merchant would pay substantially lower, but still supracompetitive, Interchange Fees. Because of the Honor All Issuers rules, Issuers have no incentive to enter into bilateral agreements outside the conspiracy; *i.e.*, Issuers are incentivized not to "cheat" on the price-fixing scheme. Thus, the default Interchange Fees have become a price floor.

46.     If there had been no Honor All Issuers rules, it would have been in the economic interest of an individual, profit-maximizing Issuer to lower the price it charged in order to compete for merchants' business against other banks issuing competing General Purpose Payment Cards. Competition also would have enabled Issuers to differentiate their products from competing Issuers' products. Visa's and Mastercard's "all or nothing" rules, however, eliminated the incentives to engage in such competition and to lower prices below the anticompetitive, cartel-determined levels set forth in the default Interchange Fee schedules. With the Honor All Issuers rules in place, it does not make economic sense for any Issuer to compete on price or quality because merchants are forced to accept that Issuer's cards even though they are being charged inflated prices fixed by the cartels. Because of these rules, Issuers have rebuffed overtures from merchants to enter into direct arrangements that would have benefitted the Issuers and their cardholders.

47.     Visa and Mastercard have argued that the Honor All Issuers rules are necessary for their networks to function because, without them, universal acceptance of their General Purpose Payment Cards cannot be assured. Visa's and Mastercard's conduct throughout the Damages Period reveals the pretextual nature of that justification. Visa and Mastercard have permitted numerous products that function at only a subset of the locations that accept Visa and Mastercard General Purpose Credit (or Debit) Cards, and the introduction and proliferation of those products

have not harmed the operation of their networks.  These include selective-acceptance (or selective-authorization) cards, which can be used only at certain merchant locations, even though they bear the Visa or Mastercard logos that supposedly connote universal acceptance of all the Visa or Mastercard brand's cards.  Examples include the increasingly-prominent flexible-spending-account cards and health-reimbursement-account cards, among others.

48.    More importantly, shortly after the preliminary approval of the now-defunct settlement in MDL 1720, Visa and Chase entered into an arrangement that gave Chase the ability to differentiate Chase-branded Visa General Purpose Payment Cards from other Visa General Purpose Payment Cards via bilateral agreements with certain merchants ("ChaseNet").  ChaseNet was designed to preserve the conspiracy while accommodating, to a limited degree, Chase's desire to compete for cardholders by differentiating its products from other Visa (and Mastercard) Issuers.  The agreement preserved the two linchpins of the horizontal conspiracy—the Honor All Issuers and default Interchange Fee rules—while also preserving the prohibition against surcharging by Issuer.  This material (albeit highly limited) deviation from the Honor All Issuers rules reinforces the conclusion that such rules are not necessary for a General Purpose Payment Card Network to function.  Moreover, even if the Honor All Issuers rules have some legitimate rationale, those objectives could be realized through less restrictive means.

49.    In addition, in early 2013, during the time frame Visa was negotiating ChaseNet, Visa began allowing discounting by Issuer at the point of sale.[2]  This represented a material

---

[2] *See, e.g.*, Visa Rule ID#: 150413-010213-0027555 (Discounts, Offers, or In-Kind Incentives (New)), *Visa International Operating Regulations* (Apr. 15, 2013), *Ch. 6—Payment Acceptance—Honoring Cards—Discount at the Point of Sale* ("Effective 1 February 2013, except where prohibited by applicable laws or regulations, a Merchant may provide Cardholders with a discount, promotional offer, or in-kind incentive at the point-of-sale that is not available for other Visa Cards."); *see also* Visa Rules 1.5.4.11 (Uniform Services – Acquirer Requirements (Updated)), 1.5.4.12 (Uniform Services – Merchant Requirement), 1.5.4.13 (Discount Offer – US Region and US Territories), 3.1.1.2 (Affinity/Co-Brand Program Positioning and Advertising), 4.1.1.1 (Visa Card Product and Token Positioning (Updated)), 4.1.1.3 (Non-Standard Card Prohibitions), 4.1.1.4 (Positioning, Acceptance, and Accounts –

departure from Visa's previous rules, which permitted no effective differentiation by Issuer at the point of sale or point of interaction, by discounting or otherwise.  Mastercard continues to prohibit discounting by Issuer at the point of sale.[3]  Visa's rule change further shows that the various rules, including the Honor All Issuers rules, barring differentiation at the point of sale by Issuer cannot be justified.  Those rules include the prohibition against surcharging by Issuer, which both Visa and Mastercard maintain to this day.  Until Visa and Mastercard repeal all the rules that bar Issuers from competing for cardholders through direct agreements with merchants—including the Honor All Issuers rules and all rules that bar Issuer differentiation at the point of sale—and repeal the default Interchange Fee rules, merchants will continue to pay supracompetitive Interchange Fees, including for the Chase transactions.

50.     On an investor call in May 2013, during which ChaseNet was discussed, Visa CEO Charles Scharf admitted that Visa's rules had barred Issuers from competing for merchant acceptance.  When asked about Visa's arrangement with Chase, Mr. Scharf stated:  **"The reality is I think if you go around and talk to most issuers, they would probably say that there** wasn't a lot of conversation that went on between the issuing and acquiring [*i.e.*, merchant] side, **partially because of our rules that stood in the way of them working together to do something positive for the merchant."**  Visa Inc. Q2 2013 Earnings Call Transcript, *FactSet CallStreet* (May 1, 2013), at 16 (emphasis added).  Those rules (with the exception of the rules now allowing discounting by Issuer at the point of sale, in the case of Visa) continue to stand in the way of banks **"working together to do something positive"** for merchants.

---

US Region), 5.4.1.2 (Uniform Services Merchant Requirement – US Region), *Visa Core Rules and Visa Product and Service Rules* (Apr. 16, 2016).

[3] *See, e.g.*, Mastercard Rule 5.11.1 (Discrimination), Ch. 16—Additional U.S. Region and U.S. Territory Rules, *Mastercard Rules* (July 7, 2016).

51.     Those rules have also stood in the way of Issuers doing "something positive" for cardholders by providing differentiated offerings.  Indeed, Chase's proposals to merchants reflect its continued adherence to the conspiracy.  Cardholders will not realize any benefits until both horizontal cartels are finally eliminated.  Until then, cardholders will continue to get less choice, less quality, and pay higher prices.

### 3.    The default Interchange Fee rules are unlawful horizontal agreements on price

52.     The default Interchange Fee rules are the mechanisms that Defendants use to fix the prices of Interchange Fees.  Throughout the Damages Period, both Visa and Mastercard required that a default Interchange Fee apply to every transaction for which the Issuer and Acquirer has not entered into a separate, individually-negotiated agreement regarding fees (*i.e.*, bilateral agreement).[4]  These rules underpinned the Interchange Fee schedules, which applied to Visa and Mastercard transactions throughout the Damages Period.

53.     While competition would have motivated rival Issuers to charge lower fees than the default Interchange Fees in order to differentiate themselves for cardholders through bilateral arrangements with merchants, they have never done so because the Honor All Issuers rules, working in tandem with the default Interchange Fee rules, eliminated any incentive for Issuers to charge fees below the anticompetitively high levels being fixed by the conspiracies.  As a result, there have been no bilateral agreements entered into by owner/member banks of Visa or Mastercard outside the conspiracy.

---

[4] *See, e.g.*, Visa Rule 9.5 (Interchange Reimbursement Fees), *Visa U.S.A. Inc. Operating Regulations, Volume 1— General Rules* (Nov. 15, 2008); Visa Rule 9.1.1.3 (Visa Determines and Publishes IRF), *Visa Core Rules and Visa Product and Service Rules* (Apr. 16, 2016); Mastercard Rule 9.4 (Interchange and Service Fees), *Mastercard Rules* (Oct. 2008); Mastercard Rule 8.3 (Interchange and Service Fees), Ch. 8—Settlement and Related Obligations, *Mastercard Rules* (July 7, 2016).

54.     In order to identify any cartel members "cheating" by secretly offering lower Interchange Fees, Visa and Mastercard monitored each transaction to ensure application of the appropriate Interchange Fee.  At the same time, throughout the Damages Period, Visa's and Mastercard's rules required all Issuers and Acquirers to adhere to all network rules.[5] Owner/member banks that violated any of these network rules were subject to fines and even expulsion from Visa and Mastercard, and, by rule, the networks could not be held liable by these banks.[6]  This enabled Visa and Mastercard to monitor compliance with, and enforce, the rules of their respective cartels.  These rules remain in place to this day.[7]

55.     All Issuers used the same default Interchange Fee schedules for any given Visa and Mastercard payment transaction but, within each of those schedules, there was wide variability in the fees charged for various transactions.  For example, a schedule of default Interchange Fees set different fee levels for different card types (*e.g.*, standard General Purpose Credit Cards versus Premium Payment Cards).  This schedule of default Interchange Fees also imposed different fee levels by merchant category, with "card-not-present" merchants (merchants that sell goods and services to consumers without face-to-face interaction, *i.e.*, typically over the Internet or by telephone or mail-order) paying substantially higher rates and with supermarkets and warehouse

---

[5] *See, e.g.*, Visa Rule 1.2.A (Member Responsibilities), *Visa U.S.A. Inc. Operating Regulations, Volume 1—General Rules* (Nov. 15, 2008); Mastercard Rule 1.5.5 (Member Responsibilities), *Mastercard Rules* (Oct. 2008).

[6] *See, e.g.*, Visa Rule 1.7 (Regulation Enforcement), *Visa U.S.A. Inc. Operating Regulations, Volume 1—General Rules* (Nov. 15, 2008); Visa Core Principles Ch. 1 (Visa Operating Regulations Governance) and 2.3 (General Liabilities and Indemnifications), *Visa International Operating Regulations* (Oct. 15, 2010); Mastercard Rules 3.1 (Standards), 3.1.2 (Failure to Comply with a Standard), and 3.3 (Indemnity and Limitation of Liability), *Mastercard Rules* (Oct. 2008).

[7] *See, e.g.*, Visa Rules 1.1.1.1 (Applicability of Rules), 1.1.1.10 (Visa U.S.A., Inc. Member Responsibilities – U.S. Region), 1.1.9 (Liabilities and Indemnifications) and 1.12.3 (Non-Compliance Assessments), *Visa Core Rules and Visa Product and Service Rules* (Apr. 16, 2016); Mastercard Rules 2.1 (Standards), 2.1.2 (Failure to Comply with a Standard), 2.2 (Conduct of Activity and Digital Activity), 2.2.1 (Customer Responsibilities), and 2.3 (Indemnity and Limitation of Liability), Ch. 2—Standards and Conduct of Activity and Digital Activity, *Mastercard Rules* (July 7, 2016).

clubs paying comparatively lower rates.  This price discrimination evidenced Visa's and Mastercard's substantial market power.  While there were different fees within a given default Interchange Fee schedule, every Issuer applied the same fee schedule to a given transaction.  It is this collusion by every Issuer to set identical default Interchange Fee schedules that constitutes price fixing.

### 4.    Merchants pay Interchange Fees directly

56.    When a merchant accepts a Visa or Mastercard General Purpose Payment Card as payment for a transaction, that merchant is the direct purchaser of General Purpose Payment Card Network Services and directly pays the Interchange Fees associated with that transaction to the Issuer.  The Issuer deducts the Interchange Fee from the sale price due to the merchant.  Accordingly, Issuers account for Interchange Fees as revenue, and merchants account for Interchange Fees as an expense.  In contrast, Acquirers do not account for Interchange Fees as an expense.  Mastercard has reported to the Securities and Exchange Commission that **"[i]nterchange fees . . . are generally the largest component of the costs that merchants pay to accept payment cards."**

57.    Issuers' prior deduction of Interchange Fees from the sale price stands in contrast to the payment of several network assessments imposed on Acquirers.  Acquirers pay these network assessments directly.  The network assessments are charged to the Acquirer, typically as part of a monthly invoice, and must be paid directly by them like any other cost of doing business (*e.g.*, electricity bills).  Acquirers treat these network assessments as expenses, unlike their treatment of Interchange Fees.

### 5. Defendants have used their price-fixing schemes to establish, maintain, and enhance their long-held market power

58.      Using price fixing to induce Issuers to join their price-fixing cartels, Visa and Mastercard acquired substantial market power in the General Purpose Payment Card markets, as courts have repeatedly determined.  For example, in *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d 322, 340, 342 (S.D.N.Y. 2001), the court determined that "[b]ecause Visa and Mastercard have large shares in a *highly* concentrated market with significant barriers to entry, both defendants have market power in the general purpose card network services market, whether measured jointly or separately; furthermore plaintiff has demonstrated that both Visa and Mastercard have raised prices and restricted output without losing merchant customers."  There, the United States "prove[d] through the testimony of merchants that they cannot refuse to accept Visa and Mastercard even in the face of significant price increases because the cards are such preferred payment methods that customers would choose not to shop at merchants who do not accept them." *Id.* at 340.  The Second Circuit affirmed this determination of market power, holding that "Visa U.S.A. and Mastercard, jointly and separately, have power within the market for network services." *United States v. Visa U.S.A. Inc.*, 344 F.3d at 239.

59.      Visa's and Mastercard's substantial market power has persisted throughout the Damages Period and remains intact today.  In its Competitive Impact Statement relating to the Proposed Final Judgment as to Visa and Mastercard in *United States v. American Express Company*, No. 10-cv-4496-NGG-RER, (E.D.N.Y.  Oct. 4, 2010), ECF No. 5, at 6, the United States Department of Justice Antitrust Division ("Antitrust Division") alleged that Visa and Mastercard possessed market power in the "network services market" for General Purpose Cards (*i.e.*, General Purpose Credit Cards and Charge Cards).  The non-discrimination restraints at issue in that case prevented merchants from "reduc[ing their] purchases of one network's services by encouraging

[their] customers to choose a competing network's General Purpose Card." *Id.* at 7. Although a merchant could theoretically resist high acceptance fees by no longer accepting Visa's or Mastercard's General Purpose Cards, the Antitrust Division recognized that the "all-or-nothing choice d[id] not effectively constrain Defendants' market power because merchants cannot refuse to accept these General Purpose Cards without alienating customers and losing significant sales." *Id.*

60.    Visa's and Mastercard's ability to profitably impose supracompetitive Interchange Fees in the General Purpose Payment Card markets has also enabled them to exercise substantial market power on the cardholder side of the market. Throughout the Damages Period, those supracompetitive fees have maintained the cohesion of the conspiracies and lured additional banks to join the horizontal conspiracies not to compete and to fix prices. These conspiracies have ensured that banks have not competed on the basis of differentiating their offerings to cardholders through direct agreements with merchants that would have enabled such differentiation at the point of sale—differentiation that would have provided value to cardholders beyond what Issuers' rewards programs provide today. Cardholders have paid higher prices and received less choice and innovation as a result.

61.    Visa's and Mastercard's substantial market power is also supported by direct evidence of that power. That evidence includes: (1) Visa's and Mastercard's ability to raise Interchange Fees and network fees without the loss of merchant acceptance or transaction volume; (2)Visa's and Mastercard's ability to limit competition among Issuers that would have benefitted cardholders; (3) successful price discrimination, as described above; (4) setting Interchange Fees unrelated to costs; (5) the ability to enforce anticompetitive policies; and (6) forcing merchants and consumers to accept inferior products—including products that are susceptible to fraud.

a.   *Ability to raise Interchange Fees with impunity*

i.   *Visa*

62.    Starting in the 1970s, Visa has possessed and exercised substantial market power in the General Purpose Credit Card Network Services market, and that market power has increased significantly since then.  By the 1990s, Visa General Purpose Credit Cards became the primary or only such cards for tens of millions of consumers in the United States.  Accepting Visa General Purpose Credit Cards became a competitive necessity for the vast majority of merchants, especially for card-not-present merchants that were heavily reliant on accepting such cards remotely.

63.    In the General Purpose Credit Card Network Services market, Visa raised General Purpose Credit Card Interchange Fees without merchants ceasing to accept Visa's General Purpose Credit Cards.  In fact, Visa typically gained volume after these increases.  For example, during the Damages Period, Visa permitted Issuers to reclassify standard Visa General Purpose Credit Cards as Premium Payment Cards and, at the flip of a switch, the Interchange Fees that merchants paid for transactions made with such cards increased dramatically.  Notwithstanding the vigorous merchant opposition to these punitive price increases, no merchant dropped Visa as a result.

64.     Visa's Interchange Fee increases outweighed any benefit that Visa claims those increases provided cardholders.  Although Visa historically has claimed that Interchange Fees are simply passed through to cardholders as rewards, the banks keep at least half the Interchange Fees they receive as supracompetitive profits.

65.    Visa continued to possess by far the highest market shares and the highest number of General Purpose Credit Cards in circulation throughout the Damages Period.  Accordingly, most merchants must accept Visa General Purpose Credit Cards to remain viable.

66.    At the beginning of the Damages Period, Visa raised its Signature Debit Card Interchange Fees, and, then throughout the Damages Period, Visa exercised its monopoly power to

increase PIN Debit Card Interchange Fees as well.  Notwithstanding these price increases, Visa's General Purpose Debit Card volumes have increased during the Damages Period.  As with Visa's General Purpose Credit Cards, merchants could not drop Visa's Signature Debit or PIN Debit Card products despite these significant price increases.  Visa's ability to increase Interchange Fees without losing merchant acceptance or transaction volume directly evidences its monopoly power in the General Purpose Debit Card market.

67.    Visa's monopoly power in the General Purpose Debit Card market and the supracompetitive nature of General Purpose Debit Card Interchange Fees were confirmed by the passage by Congress of Section 1075 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376, 2068-74 (July 21, 2010) (the "Durbin Amendment"),[8] which required the Board of Governors of the Federal Reserve System (the "Federal Reserve") to enact regulations to ensure that General Purpose Debit Card Interchange Fees for covered Issuers (*i.e.*, banks with $10 billion or more in assets) are "reasonable and proportional" to Issuer costs.  Section 920(a)(2) of the EFTA, 15 U.S.C. § 1693o-2(a)(2).  In passing the Durbin Amendment, Congress made clear that the statute was designed to address Visa's and Mastercard's ability to exercise substantial market power by raising Interchange Fees well above cost.  Its principal author, Senator Richard J. Durbin, made numerous statements to that effect on the floor of the Senate, including the following:

> *For years, Visa and Mastercard, and their big bank backers, have unilaterally fixed prices on the fees small businesses pay every time they accept a debit card from a customer.  The two giant card networks control 80 percent of the debit card market—that is Visa and Mastercard.  And it is no surprise that debit interchange fees have risen, even as the price of processing the transaction has fallen.  Finally, Visa, Mastercard, and the Wall Street banks will*

---

[8] Section 1075 amended the Electronic Fund Transfer Act (15 U.S.C. § 1693 et seq.) ("EFTA") with a new Section 920, codified at 15 U.S.C. § 1693o-2.

> *face some check against their unbridled market power in the credit and debit industries.*

156 Cong. Rec. S5, 802–03 (daily ed. July 14, 2010).  Even though the Federal Reserve found that most Issuers' costs were slightly above "par" (*i.e.*, zero), to implement the Durbin Amendment it capped both Signature Debit Card and PIN Debit Card Interchange Fees at $0.21 plus .05% plus an additional $0.01 fraud-prevention adjustment.  *See Regulation II, Debit Card Interchange Fees and Routing*, *Final Rule*, 76 Fed. Reg. 43, 394 (July 20, 2011) (setting the cap); *Regulation II, Debit Card Interchange Fees and Routing*, *Final Rule*, 77 Fed. Reg. 46, 258 (Aug. 3, 2012) (adding the fraud-prevention adjustment).  This cap, while significantly above cost for most Issuers, substantially reduced the General Purpose Debit Card Interchange Fees that prevailed for years due to Visa's dominance of this market.

### ii.    Mastercard

68.    Mastercard also has possessed and exercised substantial market power in the General Purpose Credit Card Network Services market since the 1970s, and Mastercard's market power also has increased significantly over the years.  By the 1990s, Mastercard General Purpose Credit Cards became the primary or only such cards for tens of millions of consumers in the United States.  Accepting Mastercard General Purpose Credit Cards became a competitive necessity for the vast majority of merchants, especially for card-not-present merchants that were heavily reliant on accepting such cards remotely.

69.    Like Visa, Mastercard has continually raised the Interchange Fees that merchants pay for accepting Mastercard General Purpose Credit Cards without losing merchant acceptance.  Like Visa, Mastercard permitted Issuers to reclassify standard Mastercard General Purpose Credit Cards as Premium Payment Cards and, at the flip of a switch, the Interchange Fees that merchants paid for transactions made with such cards increased dramatically.  Notwithstanding the vigorous

merchant opposition to these punitive price increases, no merchant dropped Mastercard as a result. Once a merchant begins to accept Mastercard (and Visa) General Purpose Credit Cards, it is virtually impossible for it to stop, and no merchants have.

70.     Mastercard's Interchange Fee increases outweighed any benefit that Mastercard claims those increases provided cardholders.  Although Mastercard historically has claimed that Interchange Fees are simply passed through to cardholders as rewards, the banks keep at least half the Interchange Fees they receive as supracompetitive profits.

71.     Mastercard's substantial market power was further evidenced by its ability to successfully charge merchants higher Interchange Fees than Visa charged, even though Mastercard had lower market shares.  Throughout the Damages Period, Mastercard fixed Interchange Fees that were higher than Visa's.  Mastercard designed this strategy to compensate for its self-perceived inferiority to Visa in other dimensions that could make Mastercard less attractive to Issuers absent the higher Interchange Fees.  If it did not have substantial individual market power over merchants, Mastercard could not have consistently and profitably maintained higher Interchange Fees than Visa, a competing network.

72.     Visa's and Mastercard's rules have prohibited Issuers from competing for cardholders by doing direct agreements with merchants that would have provided cardholders benefits, including lower prices, at the point of sale—benefits that would have gone beyond the rewards that Issuers offer cardholders today.  Documents produced in this litigation show that individual Issuers wanted the ability to differentiate their products by entering into such agreements, and that because of Visa's and Mastercard's substantial market power in the General Purpose Payment Card markets, Issuers instead agreed to continue not to compete and to fix prices. They have done so because they continue to make more profits from supracompetitive, collusively-

fixed Interchange Fees than they would from competing for cardholders through direct agreements with merchants.  Visa's and Mastercard's ability to limit competition for cardholders—which has raised prices and limited the choices available to them—provides further evidence of their substantial market power.

### b.    Price discrimination

73.    As one court has held, Visa's and Mastercard's "ability to price discriminate also illustrates their market power.  Both Visa and Mastercard charge differing interchange fees based, in part, on the degree to which a given merchant category needs to accept general purpose cards.

74.    Transactions with catalog and Internet merchants, for example, which rely almost completely on general purpose cards, have higher interchange fees than 'brick-and-mortar' merchants.  [Visa and Mastercard] rationalize this difference by pointing to increased fraud in these merchant categories, but this explanation is belied by the fact that the Internet merchant, not Visa/Mastercard or their member banks, bears virtually all the risk of loss from fraudulent transactions."  *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d at 340-41.  This price discrimination persisted throughout the Damages Period and continues to this day.

### c.    Setting supracompetitive prices unrelated to cost

75.    Visa and Mastercard do not set Interchange Fees based upon cost.  For example, with respect to the General Purpose Debit Card market, as noted above, the Federal Reserve found in 2011 that Visa's and Mastercard's Signature Debit Card and PIN Debit Card rates were substantially above cost.  With respect to the General Purpose Credit Card Market, Issuers' costs of issuing credit cards are much lower than the very high Interchange Fees that prevail in the United States (even including Issuers' costs of providing cardholder rewards).  Visa's and Mastercard's ability to succeed in this conduct and profit from it, including by limiting Issuer competition for cardholders, is additional direct evidence of their substantial market power.

### d.   *Enforcement of anticompetitive rules and policies*

76.    Visa's and Mastercard's successful enforcement of anticompetitive rules and policies that harmed merchants and consumers without losing merchant acceptance or transaction volume, or incurring any bank defection from the cartels, further demonstrates the substantial market power that Visa and Mastercard had, and still have, in the General Purpose Payment Card markets.  Despite the adverse economic impact of these rules and policies on merchants, their customers and cardholders, merchants could not afford to stop accepting Visa or Mastercard transactions, and no Issuer defected from the cartels, because of Visa's and Mastercard's substantial market power.

### e.   *Forcing merchants and consumers to accept inferior products*

77.    Visa's and Mastercard's success in forcing merchants and consumers to accept and use technologically-inferior products—including products that Visa and Mastercard knew would increase fraud—is further evidence of their substantial market power.  Visa and Mastercard could have dramatically reduced General Purpose Payment Card fraud in the United States during the Damages Period simply by adopting new card technology to replace the decades-old, fraud-prone technology they forced merchants and consumers to use:  a magnetic-stripe card verified by cardholder signature, which is tantamount to no verification at all.  In fact, for years Visa examined various ways to secure the payment system in the United States, but delayed in implementing more secure payment technology.  And when Visa finally decided to update its decades-old, fraud-prone technology to chip-card ("EMV") technology, as discussed more fully below, Visa chose to do so without a PIN, notwithstanding the clear security risks of that approach, because doing so supported Visa's plan to maintain its monopoly in the General Purpose Debit Card Market.

78.    In the interim, Visa and Mastercard were able, because of their substantial market power, to shift most of the cost of fraud losses to merchants in this country through the imposition

of various compliance programs and liability rules.  Visa and Mastercard did so because they and their owner/member banks profit from fraud which creates a pretextual justification for high Interchange Fees.  Visa and Mastercard also profited from fraud through punitive fines and fees for data breaches, another manifestation of their substantial market power.

79.     Visa and Mastercard have long recognized that the magnetic-stripe technology that their General Purpose Credit Card and Signature Debit Card networks utilize is inherently insecure and fraud-prone.  Yet Visa and Mastercard have perpetuated the use of magnetic-stripe technology by, among other things, delaying to take steps to implement more secure technologies.  As a result, the United States has experienced the highest fraud rates, with the gap growing.  For example, the United States was not among the top 10 countries with the most counterfeit fraud in 2004 but, by early 2010, it accounted for 85% of total counterfeit fraud among all top 10 countries combined. *See* Counterfeit Fraud Migration, European Payments Council (June 29-30, 2010) at 5-7.

80.     This is a direct result of the conspiracies detailed in this Complaint.  Despite the availability of technology to reduce fraud, Visa and Mastercard, and their owner/member banks had no incentive to adopt it in the United States or compete using better technology, because they could, and did, shift fraud-related costs to merchants and further profit from fraud while insulating the banks from its costs.  Visa's and Mastercard's ability to impose inferior-quality card products and to permit preventable fraud during the Damages Period is further direct evidence of their substantial market power.  To the extent that Great Wolf and/or Hastings and its customers were forced to absorb the costs of such fraud through chargebacks or fees or fines, such costs are damages that flow from the conspiracies.

81.     Visa's and Mastercard's substantial market power continued, and even increased, during the Damages Period. Neither Great Wolf nor Hastings could drop Visa or Mastercard General Purpose Credit or Debit Cards without losing an unacceptable number of sales.

### 6. The Mastercard and Visa IPOs were changes in corporate form that maintained and enhanced the cartels

82.     During the Damages Period, the banks that sat on the Visa and Mastercard boards, and controlled them, approved Mastercard's and Visa's reorganizations into corporate entities that offered a portion of their shares to members of the public through IPOs.  The banks took advantage of their direct control over pre-IPO Visa and Mastercard to agree to post-IPO structures for Visa and Mastercard that were designed to perpetuate, and not to disturb, the anticompetitive conduct detailed in this Complaint.

83.     Visa and Mastercard repeatedly reassured investors, employees and members that the IPOs would not cause any significant change, other than with respect to antitrust liability, stating variously that the restructurings were being done in a way that would **"ensure continuity of the core business operations,"** that existing contracts and rules would continue to govern their commercial relationships, that company operations would be **"business as usual,"** and that the new governance structure would not change the way Interchange Fees are set.  Indeed, Mastercard made it clear to its Issuers that it knew that **"any new Mastercard needed to protect and even increase interchange to keep and attract Banks."**

84.     These IPOs were a response to the growing antitrust challenges and adverse legal rulings regarding Visa's and Mastercard's organizational structures as associations of competing owner/member banks.  *See, e.g.*, Mastercard Incorporated Amendment No. 8 to Form S-1 Registration Statement (May 23, 2006) at 72-73 (noting that Mastercard had **"faced heightened regulatory scrutiny and legal challenges in recent years"**).

85.    In response to these legal defeats and a host of additional antitrust challenges, Defendants decided to change the organizational structures of Visa and Mastercard in order to attempt to evade antitrust liability through superficial changes in corporate form. But in doing so, Visa and Mastercard and their owner/member banks agreed prior to the IPOs that post-IPO Visa and Mastercard would continue to support the agreements not to compete and to fix prices.

86.    They implemented this agreement by structuring the IPOs so that they cosmetically changed the corporate forms, while leaving the anticompetitive conduct intact. Pre-IPO, the Visa and Mastercard owner/member banks conspired through Visa's and Mastercard's governing boards and/or their ownership of Visa and Mastercard to control every aspect of Visa's and Mastercard's businesses, including agreeing to fix the prices of Interchange Fees through ratification of the default Interchange Fee schedules and agreeing to set Visa's and Mastercard's rules, including maintaining the Honor All Issuers rules.

87.    Post-IPO, Visa and Mastercard act as the pricing and rules enforcement agents for their member banks. Through the corporate reorganizations and subsequent IPOs, each Visa and Mastercard owner/member bank effectively delegated to Visa and Mastercard, in perpetuity, the ability to fix the banks' pricing for their Visa or Mastercard General Purpose Payment Cards to merchants. All Visa and Mastercard owner/member banks knew that all other Visa and Mastercard banks were also delegating their pricing decisions to Visa and Mastercard, which arrangement was ratified by a horizontal agreement of Visa's and Mastercard's owner/member banks when they voted to approve Visa's and Mastercard's restructurings on these bases on the express condition that the rules that form the core of the conspiracy remain in effect for all Issuers and Acquirers in the Visa and Mastercard systems.

88.     Moreover, as part of the corporate reorganizations leading to their respective IPOs, the members of Visa and Mastercard reaffirmed and effectively readopted each network's rules, including the default Interchange Fee and Honor All Issuer rules.  Thus, all Visa and Mastercard owner/member banks' approval of this scheme was done knowing that all Visa and Mastercard owner/member banks continued to abide by the Honor All Issuer rules and all owner/member banks' Interchange Fees would be set by Visa and Mastercard.  This was a conscious commitment to an ongoing common scheme by horizontal competitors and, as such, is a continuing violation of Section 1 of the Sherman Act.  It maintains the pre-IPO status quo:  Visa and Mastercard continue to set Interchange Fees for thousands of competing banks that, but for these conspiracies, would have independently competed for merchant acceptance.  Bank documents produced in this case show that the IPOs perpetuated the conspiracies—which continue uninterrupted to this day.  Visa CEO Charles Scharf conceded as much when, five years after Visa's IPO, he characterized Visa's rules as having **"stood in the way of [Issuers and Acquirers] working together to do something positive for the merchant."**  Documents produced in this case show that Mastercard's rules also barred such competition.

89.     The IPOs increased the effectiveness of Defendants' price-fixing conspiracies as well as Visa's and Mastercard's substantial market power by consolidating decision-making and coordinating communications among the conspirators.  Visa's and Mastercard's economists opined in 1993—well before these IPOs were being considered—that "[t]here would be far less competition in this industry if Visa and Mastercard had chosen to operate as single companies."  David S. Evans and Richard L. Schmalensee, *The Economics of the Payment Card Industry*, at 103 (1993).

90.    The anticompetitive effects of these ongoing conspiracies continue to harm merchants and consumers.  The banks continue to adhere to the rules at issue, to the detriment of merchants, their customers and cardholders, without exception.  And, as a result, Visa and Mastercard continue to wield substantial market power over the market as a whole.  In this regard, Visa and Mastercard and their owner/member banks understood before the IPOs were consummated that, if Visa and Mastercard maintained the cartels' basic rules and structures, no bank would break rank and compete for merchant acceptance outside the conspiracy.  That is precisely what happened.

91.    The Defendants' post-IPO conduct confirms that the IPOs did not terminate their price-fixing cartels or reduce Visa's and Mastercard's substantial market power.  Visa's and Mastercard's anticompetitive rules, including the restraints at issue in this Complaint, have remained the same.  Neither Visa nor Mastercard, nor any bank, has taken steps to withdraw from the conspiracy.  In fact, they have done the opposite to ensure its continuation to this day.  Visa and Mastercard have exercised their substantial market power by imposing new network fees that merchants must pay.  Visa has engaged in a campaign to maintain its monopoly power in the General Purpose Debit Card market.  Perhaps most significantly, Visa's and Mastercard's Interchange Fees have remained at supracompetitive levels since the IPOs, and those fees have ensured that no bank has departed from the conspiracy.  This continuity demonstrates that the IPOs perpetuated Defendants' anticompetitive schemes and their substantial market power.

92.    Government antitrust enforcers agree that these IPOs reflected changes merely in corporate form, not substantive conduct.  In 2007, the European Commission's Competition Directorate issued a written determination that Mastercard's members had simply agreed to appoint Mastercard as their cartel manager to act in their collective best interest in setting the level

of Interchange Fees.  In particular, the Competition Directorate's comprehensive decision found

as follows:

> *Mastercard's viewpoint that the IPO . . . had changed the organisation's governance so fundamentally that any decision of Mastercard Incorporated's Global Board no longer qualifies as [a] decision of an association [of its member banks] but rather as [a] "unilateral" act which each member bank bilaterally agrees to abide by, cannot be accepted.  Mastercard's member banks shaped and eventually approved the IPO in order to perpetuate the MIF [Multilateral Interchange Fee] as part of the business model in a form that they perceived to be less exposed to antitrust scrutiny.  Contrary to Mastercard's argument, the aim of avoiding exposure to antitrust risks due to the Mastercard MIF was a clear driving force behind the IPO.  Rather than modifying the business model to bring it in line with EU competition law, the banks chose to change the governance of their co-ordination specifically for antitrust sensitive decision making.  The member banks effectively "outsourced" this decision making to a new management body and made sure that their direct influence . . . would be limited to minority rights.  However, the banks also agreed to the IPO . . . after Mastercard's management assured them that the banks' interests will continue to be preserved under a new "enhanced customer approach" and via the local input of the banks in the decision making.  <u>It cannot be doubted that in approving the IPO and thereby delegating the decision making powers for the MIF to the new independent Global Board, the member banks legitimately expected and therefore</u> agreed that this Board would henceforth set the MIF in a manner that is in their common interest.*

European Commission Decision, COMP/34.579, at ¶¶ 357, 378-379 (Dec. 19, 2007) (footnotes

omitted, emphasis added).

93.    The fact that a majority of Mastercard's post-IPO directors were "independent" did

not change the role of Mastercard as the "outsourced" pricing agent and manager of the members'

Interchange Fee cartel:

> *The circumstances that members of the Global Board are "independent" within the meaning of the NYSE criteria . . . is not a decisive question for there to be an association of undertakings.  As an organisation's members entrust decision making powers to a common body with the expectation that the body's subsequent coordination of their competitive behaviour will occur in the*

> *common interest of the members, the independence of such body is no obstacle to qualifying its decisions as decision[s] of an association of undertakings.*

*Id.* at ¶ 381.  Moreover, "[d]evelopments after the IPO also indicate that Mastercard's management takes into account concrete banks['] interests in setting the level of fallback interchange fees." *Id.* at ¶ 389.

94.    In May 2012, the European General Court affirmed the Commission's conclusions: "[T]he Commission was legitimately entitled to take the view, in essence, that despite the changes brought about by Mastercard's IPO, the Mastercard payment organisation had continued to be an institutionalised form of coordination of the conduct of the banks.  Consequently, the Commission was fully entitled to characterize as decisions by an association of undertakings the decisions taken by the bodies of the Mastercard payment organisation in determining the MIF." *Mastercard, Inc. and Others v. European Commission*, Case T-111/08, at ¶ 259 (May 24, 2012).  "[W]ith regard to merchants, what [Mastercard and its member banks] sought [post-IPO wa]s essentially the maximum threshold of their tolerance to the price of card transactions." *Id.* at ¶ 257.

### 7.    Alternatively, Defendants' price-fixing schemes are unlawful vertical price restraints

95.    Alternatively, the Interchange Fee price-fixing schemes adopted by Defendants constituted anticompetitive and unreasonable vertical price restraints.  Visa and Mastercard entered into express vertical agreements with each of their owner/member banks, binding all of their owner/member banks to comply with the rules and regulations of their networks, including the rules at issue in this Complaint.  In turn, Visa and Mastercard each acts as the enforcement agent and holds issuing and acquiring members responsible for compliance with the rules.  These two sets of vertical price restraints—one for Visa Defendants and the other for Mastercard

Defendants—continued in full effect during the Damages Period, including after Visa's and Mastercard's IPOs.

96.     For example, Rule 1.3 of the July 15, 2011 *Mastercard Rules* states:  "An applicant to be a Member must agree, and by execution and submission of an application to be a Member agrees, that it will comply with all applicable provisions of the Certificate of Incorporation and the Standards of this Corporation."  In turn, "Standards" is defined as:  "The Amended and Restated Certificate of Incorporation, Bylaws, Rules, and policies, and the operating regulations and procedures of the Corporation, including but not limited to any manuals, guides or bulletins, as may be amended from time to time."  *See* Definitions, *Mastercard Rules* (July 15, 2011). Mastercard's current rules are largely the same.[9]  Similarly, the "General Overview" of the April 10, 2011 *Visa International Operating Regulations* states:  "The *Visa International Operating Regulations* are set and modified by Visa to support the use and innovation of Visa products and services, and represent a binding contract between Visa and all Members."  Visa's current rules contain virtually identical "binding contract" language.[10]

**B.     Defendants' Interchange Fee Cartels Are Naked Restraints of Trade Without Justification**

97.     Defendants have argued over the years that Interchange Fees are cost-based and necessary mechanisms to reimburse Issuers to motivate them to issue General Purpose Payment Cards.  The facts show otherwise.

---

[9] *See, e.g.*, Mastercard Rule 1.6 (The License), Ch. 1—The License and Participation ("Each Customer agrees, and by use of any one or more of the Marks agrees, to comply with all provisions of the License pertaining to use of the Marks and with the Standards of this Corporation . . . ."); Appendix C (Definitions) (defining "Customer" as "[a] financial institution or other entity that has been approved for Participation;" "License" as "[t]he contract between the Corporation and a Customer granting the Customer the right to use one or more of the Marks in accordance with the Standards;" and "Standards" as "[t]he organizational documents, operating rules, regulations, policies, and procedures of the Corporation, including but not limited to any manuals, guides or bulletins . . ."), *Mastercard Rules* (July 7, 2016).

[10] *See* Introduction, *Visa Core Rules and Visa Product and Service Rules* (Apr. 16, 2016).

98.    General Purpose Payment Card systems have functioned successfully without Interchange Fees in the United States and internationally.  Payment card networks can thrive without Interchange Fees.  Moreover, the Interchange Fees set by Defendants are not based on cost.  Interchange Fees offer no procompetitive justification to offset the anticompetitive harm caused by the conduct detailed in this Complaint.

**1.    Banks would profit from issuing General Purpose Debit Cards even without collectively-set Interchange Fees**

99.    General Purpose Debit Cards have long been positioned by Visa and Mastercard and the banks as a replacement for cash and checks, both of which have cleared "at par" (*i.e.*, zero interchange) for decades.  As such, Issuers have strong economic incentives to issue General Purpose Debit Cards even without income from Interchange Fees.  General Purpose Debit Cards provide numerous economic benefits to Issuers that justify their issuance even without Interchange Fees.  These benefits include:  (1) savings relative to the costs of processing checks and cash; (2) motivating cardholders to maintain larger bank deposits, which Issuers can then lend; and (3) helping the Issuer to cross-sell other lucrative services, such as mortgages, home equity lines, and credit cards.  Moreover, issuance of General Purpose Debit Cards enhances the "stickiness" of the Issuer's valuable relationship with its customers.

100.    When networks and banks first began to offer PIN Debit Cards in the United States, they did not charge Interchange Fees.  To the contrary, they paid merchants to provide PIN Debit Card services, a practice known as "reverse," "negative," or "Issuer-paid" interchange.  Other banks provided PIN Debit Card services at par.  The market for General Purpose Debit Card Network Services expanded substantially during the time of Issuer-paid, at-par Interchange Fees.  This model prevailed until the early 1990s, when it changed only because Visa and Mastercard extended their cartels into debit.

101.    Beginning in the early 1990s, Visa and Mastercard aggressively began to implement and enforce a strategy to leverage their substantial market power in the General Purpose Credit Card market and force merchants to pay supracompetitive General Purpose Debit Card Interchange Fees.  The linchpin of this strategy was the enforcement of "credit/debit tying rules" which, until January 1, 2004, forced merchants that accepted Visa's and Mastercard's dominant General Purpose Credit Cards to also accept the networks' Signature Debit Card transactions.  Visa and Mastercard set the same or similar Interchange Fees for General Purpose Credit Card and Debit Card transactions notwithstanding the different costs and demand characteristics of such transactions.   Merchants had no choice but to accept Visa's and Mastercard's dominant, supracompetitively-priced General Purpose Credit Card products and were, therefore, forced to accept supracompetitive Signature Debit Card Interchange Fees.

102.    Visa (and to a lesser degree Mastercard) then used the lucrative Interchange Fee stream created by this practice to induce additional Issuers to participate in the conspiracy, and, in the case of Visa, thereby entrench its dominance in the General Purpose Debit Card market.  This strategy successfully destroyed the at-par Interchange Fee model that had prevailed for PIN Debit Cards prior to the 1990s, as Visa had intended.  Moreover, it distorted banks' incentives in debit, causing them to push the less secure, less efficient Signature Debit Card products of Visa and Mastercard and to suppress the safer, cheaper, and faster PIN Debit Card products that were being promoted by the competing PIN Debit Card networks, such as NYCE and STAR.

103.    The substantial non-interchange economic benefits of issuing General Purpose Debit Cards explain why Issuers did not anticipate any significant adverse impact as a result of the regulatory cap that the Federal Reserve placed on General Purpose Debit Card Interchange Fees in the United States pursuant to the Durbin Amendment, discussed above.   Addressing that

impending regulatory cap, the CEO of Citigroup said: "We don't have much of an impact on debit card interchange or overdraft fees. Those are really small impacts on us." Citigroup Inc. Q4 2010 Earnings Call Transcript (Jan. 18, 2011). The Chairman and CEO of City National Corporation predicted: "The Durbin amendment on debit card interchange fees . . . its economic impact on City National is not going to be material." City National Corporation Q4 2010 Earnings Call Transcript (Jan. 20, 2011). TCF Financial Corp.'s Chairman and CEO added that "[w]e'll obviously still be profitable" even if there is a cap imposed on debit Interchange Fees. Transcript to TCF Financial Corp.'s Conference Call, *TCF Discusses Lawsuit Challenging Durbin Amendment* (Oct. 12, 2010).

104. The fact that General Purpose Debit Card issuance continues to be profitable and that debit volumes have increased since General Purpose Debit Card Interchange Fees for regulated banks declined significantly beginning in late 2011 reinforce the conclusion that General Purpose Debit Card Interchange Fees had been fixed at supracompetitive levels throughout the Damages Period.

105. The experience in other industrialized countries also highlights that the development of debit in the United States, with cartel-determined supracompetitive Interchange Fees, was a function of anticompetitive conduct in the General Purpose Debit Card market in this country. Virtually all the countries with the highest debit usage—including Canada, Denmark, Finland, Iceland, the Netherlands, New Zealand, and Norway—utilize an at-par (*i.e.*, zero) interchange pricing model. For example, the Canadian debit system has always been based on at-par pricing, and Canada has traditionally had higher per-capita debit usage than the United States, as well as higher debit penetration in merchant categories that do not accept PIN Debit Cards in the United States.

106.    The vast and successful U.S. checking system also demonstrates that Interchange Fees are not necessary for a General Purpose Debit Card Network to function.  Since 1916, by rule of the Federal Reserve, trillions of dollars of checks drawn on the U.S. national banking system have cleared at par.  Despite this prohibition on Interchange Fees, banks have continued to offer checks to their customers and have continued to accept and cash checks issued by other banks.

**2.    Banks would profit from issuing General Purpose Credit Cards even without collectively-set Interchange Fees**

107.    In the 1980s, the default Interchange Fee rules were rationalized as being necessary to give General Purpose Credit Card Issuers incentives to issue such cards.  By 1990, it was apparent that General Purpose Credit Card Issuers were earning substantial profits from interest rates on revolving balances and annual fees, and therefore Interchange Fees were unnecessary to encourage General Purpose Credit Card issuance.  Since then, the evidence—including bank documents produced in this litigation—has further shown that General Purpose Credit Card Issuers could profitably maintain their current rewards programs without collectively-set Interchange Fees, because Issuers earn substantial revenues from revolving balances and cardholder fees and because they keep at least half the Interchange Fees they receive from merchants without passing them through to cardholders as rewards.

108.    International experience regarding Interchange Fees on General Purpose Credit Card transactions also indicates that Interchange Fees in the United States have been fixed at supracompetitive levels.  In Australia, the Reserve Bank of Australia regulated Visa's and Mastercard's General Purpose Credit Card Interchange Fees during the past decade.  Those regulations mandated a nearly 50% reduction (to an average of 50 basis points) of those Interchange Fees, rates that are much lower than those that prevailed in the United States during the Damages Period.  Prior to enactment of these regulations, Visa and Mastercard argued that

such a reduction in Interchange Fees would cause a "death spiral" that would lead to a collapse of their networks and upheaval in the industry. In reality, no such "death spiral" or collapse occurred. Visa's and Mastercard's General Purpose Credit Card volumes have increased in Australia since the regulations went into effect. Indeed, the European General Court reviewed the evidence from Australia and, in 2012, concluded: "It is clear . . . that a substantial reduction in the Mastercard system's interchange fees that was imposed by the Reserve Bank of Australia had no notable impact on the system's viability . . . ." *Mastercard, Inc. and Others v. European Commission*, Case T-111/08, at ¶ 111 (May 24, 2012).

109.    Similarly, the European Commission undertook a comprehensive study of General Purpose Credit Card Interchange Fees in Europe, and its Competition Directorate undertook antitrust investigations into Interchange Fees charged by Mastercard's and Visa's European affiliates. In 2002, the Commission and Visa reached a settlement that lowered Visa's Interchange Fees first to 0.7%, and then to a cost-based standard if lower. That commitment expired in 2007 and Visa announced in May 2013 that it would limit Interchange Fees for credit card transactions to 0.3%. In 2007, the Commission found Mastercard's setting of Interchange Fees to be unlawful, and Mastercard agreed to cap its Interchange Fees for transactions crossing national borders at 0.3% during the pendency of its appeal of that decision. The European Court of Justice has since upheld the Commission's finding that Mastercard's setting of Interchange Fees was unlawful. Following this decision, the European Commission announced regulations for all domestic and cross-border credit card transactions that capped credit card Interchange Fees for both Visa and Mastercard transactions at 0.3%. The resulting European Interchange Fees have been substantially below those that prevail in the United States that often exceed 2.00% due to the proliferation of Premium Payment Cards. Again, there have been no adverse effects—Visa's and Mastercard's

General Purpose Credit Card volumes in Europe have increased during this period. Indeed, Mastercard CEO Ajay Banga told investors in September 2016 that **"reducing [interchange] in Europe is actually leading to greater acceptance of merchants."** Mastercard's (MA) CEO Ajay Banga Hosts 2016 Investment Community Meeting – Transcript, *SeekingAlpha* (Sept. 8, 2016).

110.    In neither Australia nor the European Union do Visa and Mastercard enjoy the economies of scale and scope associated with the much larger General Purpose Payment Card markets in the United States. Visa's and Mastercard's General Purpose Credit Card Interchange Fees in the United States are <u>higher</u> than those of nearly every other General Purpose Credit Card Network outside the United States, including Visa's and Mastercard's own networks in other countries.

111.    The costs associated with issuing Visa and Mastercard General Purpose Credit Cards have declined dramatically since 1990. Issuer costs of funding a cardholder's grace period—known as float costs—have fallen significantly. Visa and Mastercard General Purpose Credit Card Issuers have enjoyed additional savings from substantial decreases in hardware, processing and telecommunications costs, as well as through economies of scale that have resulted from vastly-increased transaction volumes and concentration of card issuance through bank mergers and card portfolio acquisitions.

112.    Notwithstanding those declines in Issuer costs, however, Visa and Mastercard have substantially raised their Interchange Fees. For example, Visa has raised the Interchange Fees and/or costs of acceptance that apply to Visa General Purpose Credit Card transactions throughout the Damages Period. Mastercard has done the same. Neither Visa's nor Mastercard's price increases are based on costs, but rather are a cartel's anticompetitive exercise of market power.

That those fees have cemented banks' adherence to their agreement not to compete for cardholders via merchant differentiation reinforces this conclusion.

113.    Visa and Mastercard have argued that default Interchange Fees are justified because, as a result of their Honor All Issuers rules, an individual Issuer could otherwise potentially "hold up" merchants that accept Visa's and Mastercard's General Purpose Payment Cards by charging as high an Interchange Fee as that Issuer wishes. This "hold-up" problem is the result of the banks' anticompetitive agreements not to compete for merchant acceptance, *i.e.*, the Honor All Issuers rules. Attempting to justify Interchange Fee price fixing on the grounds that it addresses the problems of an agreement not to compete, as Defendants have sought to do, is perverse. Price fixing in tandem with an agreement not to compete is not a justification for anticompetitive conduct. It is anticompetitive conduct.

114.    Moreover, these schemes create a staggering amount of anticompetitive harm. Even if the elimination of this additional anticompetitive "hold-up" problem (an anticompetitive problem created by the schemes themselves) was credited as a procompetitive benefit—which it should not be—any such "benefit" would be far exceeded by the remaining anticompetitive harm resulting from those schemes that is detailed throughout this Complaint. Such harm includes higher fees to merchants and consumers, and higher prices and a loss of choice and innovation that has harmed cardholders.

### 3.    Anti-steering rules hid the costs of Visa and Mastercard transactions from consumers, thereby inhibiting competition from other networks and reinforcing the Visa and Mastercard cartels

115.    In a competitive world, some merchants could have used financial incentives and marketing to steer customers to other networks or to lower-cost Issuers or forms of payment, and, by increasing customers' price sensitivity to Interchange Fees, steering could have led to network or Issuer competition. Visa and Mastercard have prevented this from happening by enforcing anti-

steering rules that have prohibited merchants from making the cost of Visa and Mastercard transactions transparent to consumers and from making the consumers who use the cards bear the associated costs.

116.    During the Damages Period, the anti-steering rules included Visa's and Mastercard's rules that prohibited merchants from offering discounts to consumers that used General Purpose Payment Cards that were less expensive than Visa or Mastercard General Purpose Payment Cards. These rules remained in effect until Visa and Mastercard revised them to permit such discounting pursuant to a July 20, 2011 consent decree they entered into with the Antitrust Division.[11]

117.    The anti-steering restraints also include rules that prevented (and still prevent) banks from linking to multiple networks on General Purpose Credit Cards, such as no-bypass and no-competing-marks rules.[12] Because of the way the General Purpose Debit Card industry developed, with most cards originating as ATM/PIN Debit Cards, General Purpose Debit Cards have long had multiple network linkages (or "bugs") on them, and that has facilitated the most effective form of steering for merchants—routing transactions to cheaper General Purpose Payment Card Networks. There is no technical reason why multiple network functionality could

---

[11] *See*, *e.g.*, Visa Rule ID#: 111011-010410-0008590 (Discount Offer – U.S. Region 5.2.D.2 (Updated)), Ch. 6—Payment Acceptance—Honoring Cards—Discount at the Point of Sale, Visa International Operating Regulations (Oct. 15, 2011) (reflecting rule effective through July 19, 2011 and revision effective July 20, 2011); see also Mastercard Rule 5.11.1 (Discrimination), Ch. 5—Prohibited Practices, Mastercard Rules (July 15, 2011) compared to Mastercard Rule 5.11.1 (Discrimination), Chs. 5—Prohibited Practices and 15—United States Region Rules, Mastercard Rules (Dec. 7, 2011).

[12] *See, e.g.*, Visa Rule 7.1.1.4 (Required Use of VisaNet for Processing – US Region), *Visa Core Rules and Visa Product and Service Rules* (Apr. 16, 2016); Visa Rules 1.3.4.4 (Use of Competitive Marks with the Visa-Owned Marks), 1.3.4.7 (Prohibited Use of Competitive Trade Name or Mark), 4.1.1.1 (Visa Card Product and Token Positioning (Updated)), and 4.1.1.4 (Positioning, Acceptance, and Accounts – US Region), *Visa Core Rules and Visa Product and Service Rules* (Apr. 16, 2016); Mastercard Rule 4.9 (Use of Marks on Mastercard Cards), Ch. 4—Use of the Marks, *Mastercard Rules* (July 7, 2016).

not co-reside on General Purpose Credit Cards.  Visa and Mastercard rules, however, blocked that from happening throughout the Damages Period.

118.    The anti-steering restraints also include the rules that prevent merchants that accept Visa and Mastercard from testing differential acceptance or new ways to steer transactions to cheaper General Purpose Payment Card Networks at certain locations that operate under a single banner.  That is the way most merchants pilot new products, and such testing would have enabled merchants to introduce new ways to force the banks to compete for merchant acceptance.

119.    The anti-steering rules also included Visa's and Mastercard's prohibitions against surcharging their transactions.  Visa's previous no-surcharge rule (*see, e.g.*, Visa Rule 5.2.F (Prohibitions), *Visa U.S.A. Inc. Operating Regulations, Volume 1—General Rules* (Nov. 15, 2008)) provided that "[a] Merchant must not . . . [a]dd any surcharge to [t]ransactions." Mastercard's previous no-surcharge rule (*see, e.g.*, Mastercard Rule 5.9.2 (Charges to Cardholders), *Mastercard Rules* (Oct. 2008)) similarly provided that "[a] Merchant must not directly or indirectly require any [Mastercard] Cardholder to pay a surcharge or any part of any Merchant discount . . . ."  The no-surcharging rules remain in place for Visa and Mastercard General Purpose Debit Card transactions.[13]

120.    For General Purpose Credit Card transactions, in 2013, Visa and Mastercard agreed with one another to implement the same revised anti-surcharging rules during their negotiations of the class settlement in MDL 1720.  Although the class settlement has been vacated, Visa and Mastercard have maintained their collusively determined, anticompetitive anti-surcharging rules.[14]

---

[13] *See, e.g.*, Visa Rule 1.5.5.2 (Surcharges), *Visa Core Rules and Visa Product and Service Rules* (Apr. 16, 2016); Mastercard Rule 5.11.2 (Charges to Cardholders), Chs. 5—Acquiring and 16—Additional U.S. Region and U.S. Territory Rules, *Mastercard Rules* (July 7, 2016).

[14] *See, e.g.*, Visa Rule 5.6.1 (Surcharges – Allowances, Requirements, Restrictions, Amounts, and Disclosures) (including Visa Rules 5.6.1.1–5.6.1.5), *Visa Core Rules and Visa Product and Service Rules* (Apr. 16, 2016);

121. Under Visa's and Mastercard's now-current anti-surcharging rules, merchants accepting American Express credit cards must limit their surcharging of Visa/Mastercard General Purpose Credit Cards to the same terms that American Express limits surcharging of American Express credit cards.[15] American Express prohibits surcharging its credit cards unless all payment cards, including debit cards, are also equally surcharged, but Visa and Mastercard do not permit debit card surcharges. To avoid this effective bar against surcharging, a merchant must stop accepting American Express credit cards, an outcome that would only reinforce Visa's and Mastercard's substantial market power. This Catch-22 effectively prohibits credit card surcharging by merchants that accept American Express: 90% of merchants by U.S. credit card volume. Moreover, the remaining 10% of merchants that theoretically could surcharge are unlikely to do so, because they will risk losing sales to competing merchants that accept American Express and therefore cannot surcharge.

122. When Visa and Mastercard agreed among themselves to these revised anti-surcharging rules, each knew and intended that their effect would be to prohibit surcharging. And each knew and intended that prohibiting surcharging would restrain price competition among them, *i.e.*, such as granting merchants reduced Interchange Fees or network fees so that merchants would not surcharge one network in favor of the other. Such a horizontal agreement to restrain price competition is *per se* unlawful.

123. There are no procompetitive justifications for these anti-steering rules. If merchants had not been restrained by these rules, some of them could have played Visa and

---

Mastercard Rule 5.11.2 (Charges to Cardholders), Ch. 16—Additional U.S. Region and U.S. Territory Rules, Mastercard Rules (July 7, 2016).

[15] *See, e.g.*, Visa Rule 5.6.1.2 (Similar Treatment of Visa Transactions – US Region and US Territories), *Visa Core Rules and Visa Product and Service Rules* (Apr. 16, 2016); Mastercard Rule 5.11.2.1 (Brand-level Surcharging), Ch. 16—Additional U.S. Region and U.S. Territory Rules, *Mastercard Rules* (July 7, 2016).

Mastercard or the banks against one another by steering or threatening to steer customers away from using more expensive Visa and Mastercard General Purpose Payment Cards. Were it not for the restraints, merchants could have used such tactics to try to negotiate more favorable terms from Visa or Mastercard. As a result, the anti-steering rules, individually and collectively, exacerbated the anticompetitive effects of the conspiracies.

**C. The Visa Defendants Engaged in Additional Anticompetitive Conduct That Monopolized, or Attempted to Monopolize, the General Purpose Debit Card Services Market**

124. The Visa Defendants' anticompetitive conduct has not been limited to the Interchange Fee price-fixing cartels detailed above. The Visa Defendants engaged in additional conduct with the purpose and effect of excluding competition and giving Visa a monopoly in the market for General Purpose Debit Card Network Services.

125. Visa's exclusionary acts have continued to suppress competition in the market for General Purpose Debit Card Network Services, and thereby have enabled Issuers to charge higher Interchange Fees and Visa to charge higher network fees than they otherwise would have been able to charge merchants. Also, as a direct consequence of Visa's exclusionary conduct, Great Wolf and Hastings' had been forced to incur substantial expenses in migrating their payment systems to the EMV technology which Visa forced upon them on pain of increased fraud liability. Visa's anticompetitive conduct has still further damaged Great Wolf and Hastings' by resulting in payment-fraud liability that it should not have incurred.

126. Visa's exclusionary acts have also harmed consumers through higher prices and forcing on the marketplace technology (magnetic-stripe technology and signature authentication of transactions) that is significantly less secure and more prone to fraudulent transactions than alternatives (PIN authentication).

### 1.    Visa's strategy to maintain its monopoly power in the General Purpose Debit Card market

127.    When the Damages Period began, Visa possessed monopoly power in the General Purpose Debit Card market, with its Signature Debit product as the linchpin of its strategy. Its share of that market was approximately 60%, as it comprised 80% of the Signature Debit Card segment and was increasing its Interlink network's PIN Debit Card share through agreements with the largest Issuers of Visa General Purpose Debit Cards. By early 2004, Visa had entered into long-term agreements with most of its large Issuers that "prevent[ed] Visa banks from switching to Mastercard" which, at the time, was the only other Signature Debit Card network. *United States v. Visa U.S.A. Inc.*, No. 98-cv-7076(BSJ), 2007 WL 1741885, at *2 (S.D.N.Y. July 15, 2007). Accordingly, Visa "essentially lock[ed] up 89% of the volume of its top 100 debit Issuers." *Id.* at *1. Those agreements and the installed base of Visa- and Interlink-branded General Purpose Debit Cards enabled Visa to maintain its monopoly power even after it was forced in 2004 to relinquish the tying rule by the antitrust settlements in the *In re Visa Check/MasterMoney Antitrust Litigation*, No. 96-cv-5238(JG) (E.D.N.Y.) ("*Visa Check*").

128.    By 2005, Visa's Interlink network had become the leading PIN Debit Card network, with 36% of that segment of the General Purpose Debit Card market. Visa maintained that position in PIN Debit, along with its dominant position in Signature Debit, throughout the Damages Period. It did so through numerous exclusive or near-exclusive agreements with debit Issuers which made Visa's Interlink acceptance mark the exclusive or primary PIN Debit Card acceptance mark on well over 100 million General Purpose Debit Cards. Visa was able to do this because of its high share of high-interchange Signature Debit Card transactions, the prospect of which Visa could use to incent the banks to exclude competing PIN Debit Card networks from the banks' General Purpose Debit Cards. These agreements gave Visa the power to raise Interlink's Interchange Fees

during the Damages Period because, even if a merchant tried to drop Interlink and its high rates, the merchant would pay more as transactions defaulted to the still-pricier Visa Signature Debit Card rates. There were no other routing options on many Visa General Purpose Debit Cards.

129. Even where competing PIN Debit Card networks were able to get on the banks' cards, Visa used its monopoly power to suppress PIN Debit competition during the Damages Period. As Visa continued to drive up Interlink Interchange Fees, the competing PIN Debit Card networks were forced to raise their rates to maintain volume or gain any volume with Issuers in a market that had long been dominated by Visa. Visa was aware that its rate increases would compel the PIN Debit Card networks to follow suit. The result was the convergence of PIN Debit Card and Signature Debit Card rates at high *ad valorem* prices, a trend that contributed significantly to the suppression of PIN Debit Card acceptance in the United States, a longstanding Visa objective. With Signature Debit Card and PIN Debit Card Interchange Fees coming into alignment, merchants' ability to install PIN pads to accept PIN Debit Cards was materially reduced, satisfying another Visa objective to protect its dominance in Signature Debit. In PIN Debit alone, because of Visa's conduct, merchants faced market-wide effective Interchange Fee increases of an estimated 234% between 1998 and 2006. The suppression of PIN Debit also harmed consumers by limiting the acceptance of the safer PIN Debit product and by raising the prices that all consumers, including cash customers, pay for goods and services.

### 2. Visa's strategy to maintain its monopoly power in the General Purpose Debit Card market after the Durbin Amendment

130. By 2010, when Congress passed the Durbin Amendment, Visa's monopoly power in the General Purpose Debit Card market had been resting on Signature Debit's higher Interchange Fees which Visa was using to incent Issuers not to use cheaper PIN Debit Card networks and to otherwise undermine PIN Debit competition. The Durbin Amendment, the

purpose of which was to stimulate competition in the General Purpose Debit Card market, threatened the foundation of Visa's monopoly power in two major ways. First, the regulations that the Federal Reserve promulgated capped General Purpose Debit Card Interchange Fees, eliminating the advantage Signature Debit had for the large regulated Issuers by reducing the Signature Debit Card Interchange Fees that those regulated Issuers could receive.

131.    Second, the Durbin Amendment repealed Visa's exclusive or near-exclusive agreements with Issuers by requiring that all General Purpose Debit Cards bear an unaffiliated network on each card, and codified merchants' rights to control the routing of General Purpose Debit Card transactions. Once debit cards were linked to two competing networks, merchants could use their routing rights to ensure that the networks had to compete for merchant volume. That requirement subjected Visa to potential competition to reduce Interchange Fees and network fees even further in order to win merchant routing decisions. Many commentators observed that Visa could lose significant portions of its volume, and at least one concluded that up to 80 percent of Visa's PIN Debit Card volume was at risk.

132.    Faced with these material threats to its monopoly power, Visa embarked on its latest anticompetitive campaign to block the competition that the Durbin Amendment was designed to open. The first prong of that campaign was Visa's imposition of the Fixed Acquirer Network Fee ("the FANF"), which has forced merchants to route General Purpose Debit Card transactions to Visa, and away from PIN Debit Card networks, if the merchants accept Visa General Purpose Credit Cards (as merchants must because of Visa's market power). The FANF has re-effectuated the anticompetitive tie-in of Visa General Purpose Debit Cards to Visa General Purpose Credit Cards. The second prong of Visa's post-Durbin anticompetitive campaign was its implementation and exploitation of EMV technology to subvert competition from PIN Debit Card networks.

a.    *The FANF*

133.    In response to the Durbin Amendment, Visa implemented a fixed fee known as the FANF, effective April 2012.  The FANF is nothing more than a substantial price increase on merchants that Visa is using strategically as a lever to gain General Purpose Debit Card routing agreements with merchants.  If the merchant accepts any Visa General Purpose Payment Card transactions, credit or debit, the merchant must pay a fixed fee to "access" Visa's networks, and, perversely, the more locations the merchant operates the greater the fee it has to pay.  This construct restores the tie between General Purpose Debit Card acceptance and General Purpose Credit Card acceptance that Visa previously utilized as the linchpin of its strategy to dominate the General Purpose Debit Card market.  It does so because the only way merchants can avoid the fee is to drop all Visa products (which they cannot do because of Visa's substantial market power in the General Purpose Credit Card market), and the only way merchants can mitigate the fee is to route General Purpose Debit Card volume to Visa under routing agreements.  The FANF further penalizes a merchant for routing a transaction over a competing PIN Debit Card network because, if the merchant did that, then it would not be able to reduce the fees it must pay for Visa transactions by shifting volume to Visa.  In fact, because the merchant must pay Visa's fixed fee whether it routes the transaction to Visa or not, the merchant will, in effect, pay twice for the transaction if it routes the transaction to a competing PIN Debit Card network.

134.    The FANF maintained Visa's monopoly power by compromising the competing PIN Debit Card networks' ability to compete and by neutralizing the competitive dynamic that should have been introduced by the Durbin Amendment.  While Visa leveraged its power in the General Purpose Credit Card market to distort competition in the General Purpose Debit Card market with the FANF, the competing PIN Debit Card networks could not (and cannot) do that. They could not tie General Purpose Debit Card network acceptance to a dominant General Purpose

Credit Card network, and, if they tried to implement such an onerous fee, merchants would have stopped accepting their General Purpose Debit Cards. As a result, Visa gained a war chest that empowered it to gain debit routing agreements with merchants that could not (and cannot) be matched by the competition. Simultaneously, Visa entered into routing agreements with large Acquirers under which the Acquirers routed transactions nearly exclusively through Visa for transactions originating at merchants not already covered by Visa's individual merchant routing agreements. By doing so, Visa achieved volumes, which maintained its monopoly power, not because it had (or has) better General Purpose Debit Card Networks but because it had (and still has) the power to use a tying arrangement and an anticompetitive fixed fee to foreclose competition.

135.    At least one industry analyst recognized that Visa's conduct was likely to severely foreclose competition from PIN Debit Card networks and cement Visa's market power:

> "Tapping the entire Visa customer base to subsidize aggressive PIN-debit pricing should significantly boost Interlink's market share, possibly above today's exclusivity-driven levels. This aggressive approach is clearly bad news for competing PIN-debit networks as they simply won't be able to match price with post-Durbin Visa." See Chris Brendler et al., "New Fee Structure; Near-Term Pain, Long-Run Gain," Stifel Nicolaus (Aug. 1, 2011).

> "In our view, the [FANF], once established, should actually increase Visa's long-run pricing power since merchants will have little ability to deter future price increases . . . [W]e think this fee gives Visa enormous long-run pricing power as there are few governors on future price increases . . . Over time, we think Visa near-term margin sacrifice will be easily offset by market share gains and additional pricing power." Id.

### b.    The U.S. migration to EMV technology

136.    For years, Visa abetted the fraud-prone payment system in the United States to the detriment of consumers. In a recent public filing, Visa has admitted that the magnetic-stripe

system it (and Mastercard) had maintained in the United States exposed the U.S. payment system to counterfeit fraud.  *See* Answer & Counterclaims of Visa U.S.A. Inc., Doc. No. 28 at 24, ¶ 35, *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, Index No. 652530/2016 (Sup. Ct. N.Y. Cnty., June 29, 2016).

137.    Outside the United States, beginning as early as 1994, Visa and Mastercard adopted "chip-and-PIN" cards which utilize both data encryption on a microchip embedded on the card (to inhibit counterfeiting which plagues magnetic-stripe cards), and cardholder entry of a PIN (to inhibit use of counterfeit, lost, or stolen cards).  For years, Visa and Mastercard delayed bringing that technology to the United States.

138.    By 2010, Visa began to urge the adoption of alternative technologies to secure the U.S. payment system. Such technologies would have addressed e-commerce or card-not-present fraud, unlike EMV, which does nothing to stop that type of fraud.  Visa acknowledged that in the United States, as of 2010, the  costs of EMV largely would be borne by merchants and their customers, could not be justified.

139.    When the Durbin Amendment passed in 2010, Visa changed course and decided to push EMV, despite its recognition that better solutions existed in the marketplace.  Spurred by the Durbin Amendment's threat to Visa's monopoly in the market for General Purpose Debit Card Network Services, Visa devised a plan to force merchants to incur the costs to implement EMV technology, which Visa could do because of its substantial market power.  Visa did so to, among other things, implement and exploit EMV technology in order to control transaction routing and subvert the competition among General Purpose Debit Card networks that the Durbin Amendment was designed to foster.

140.    The Durbin Amendment capped General Purpose Debit Card Interchange Fees for large banks, and the cap did not distinguish between Signature Debit Card Interchange Fees and PIN Debit Card Interchange Fees.  Faced with projections of large declines in Interchange Fee income, Visa's large General Purpose Debit Card Issuers demanded that Visa shift General Purpose Debit Card fraud liability to merchants but—critically—*only* for Signature Debit Card transactions, given that Signature Debit fraud was 10 times that of PIN Debit fraud.  Visa knew that imposing liability for Signature Debit fraud on merchants, as Visa's banks demanded, would drive increased PIN Debit adoption and steering by merchants.  While such steering would have been beneficial to consumers as it would have promoted the much safer PIN Debit, it was problematic for Visa because it could have undermined Visa's debit monopoly and cost Visa billions in revenue.

141.    The threat to Visa's monopoly was exacerbated by competing PIN Debit Card networks' development of "PINless" Debit, which does not require entry of a PIN for transactions under a certain amount (today, typically $50).  PINless Debit has the potential to expand significantly the number of transactions routed to Visa's PIN Debit Card network competitors, transactions for which PIN Debit has traditionally been unavailable.  Visa's competitors also were developing Signature Debit capability, and the combination of PINless Debit and Signature Debit would have enabled them, for the first time, to compete for merchant routing on all General Purpose Debit Card transactions.  But to support its post-Durbin monopolization strategy, Visa entered into agreements with Issuers to incent or require them not to implement PINless Debit from PIN Debit Card networks, such as STAR and PULSE.

142.    Against this backdrop, Visa devised a plan to force U.S. migration to EMV technology in order to blunt these emerging threats to its monopoly power.  In August 2011, shortly

after the Durbin Amendment regulations were finalized, Visa announced that, effective October 2015, liability for counterfeit fraud transactions—both credit and debit—would shift from Visa's banks to non-EMV-capable merchants for counterfeit fraudulent transactions on EMV-issued cards. This liability shift applied to all Visa transactions except for those completed at gas station pumps, for which the liability shift was set to go into effect in October 2017. Visa's market power in both the General Purpose Credit Card and Debit Card markets forced other networks, including Mastercard, to follow Visa's lead. Mastercard subsequently announced a substantially similar liability shift, also taking effect in October 2015.

143.    Visa's plan for migration to EMV forced merchants to undertake the massive, and otherwise unnecessary, expenditure of replacing their current point-of-sale hardware and software with new EMV terminals—despite the existence of better technologies to secure the U.S. payment system. Visa forced EMV technology on the industry knowing that it would cost merchants (and their customers) billions to implement EMV and that the Acquirers and processors that support merchant acceptance of Visa transactions could not enable compliance by the vast majority of merchants before the October 2015 deadline. Visa would then exploit the time crunch it had created to ensure that its proprietary EMV technology would become the industry standard, instead of competing open technologies that would have been configured to stimulate meaningful across-the-board competition in debit.

144.    Visa, tellingly, implemented EMV technology without requiring the entry of a PIN for all EMV transactions. According to data from the Federal Reserve, lost-and-stolen card fraud, which authentication of the transaction through a PIN prevents, accounts for a substantial portion of the fraud losses that consumers pay, and Visa recently admitted that lost-and-stolen fraud constitutes approximately 10% of overall payment fraud. *See* Answer & Counterclaims of Visa

U.S.A. Inc., Doc. No. 28 at 15, ¶ 4, *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, Index No. 652530/2016 (Sup. Ct. N.Y. Cnty., June 29, 2016).

145.    Visa knew that EMV technology without a PIN would not be as effective in combating fraud, because signature verification is tantamount to no verification at all.  As EMVCo's Acquirer and Terminal Security Guidelines state:  "All of the PIN methods [of cardholder verification] involve a precise interaction with the cardholder, the result of which is either right or wrong, whereas signature requires a human comparison that is subjective."[16]  That is why chip-and-PIN, and not chip-and-signature, is the better and standard practice around the world for reducing payment fraud.  In Europe, Canada, and Australia, Visa itself has extolled the benefits of chip-and-PIN in combating fraud.  For example:  "The decline in Lost/Stolen and NRI [Not Received as Issued] fraud in the United Kingdom . . . is considered by Visa to be substantially, if not entirely, attributable to mandatory PIN@POS."[17]  Yet, Visa has done the opposite in the United States, exposing cardholders to burdensome fraud, because it wants to protect the linchpin of its monopoly power in the market for General Purpose Debit Card Network Services:  its Signature Debit product.

146.    Visa's (and Mastercard's) announcement touched off a scramble by the industry to develop the software that would enable Visa's (and Mastercard's) proprietary EMV technology to work throughout the payment system, including by the Acquirers and processors that support merchant acceptance of Visa General Purpose Payment Cards.  Most importantly, the liability shift touched off a scramble to develop a technological solution to enable merchant control over General

---

[16] EMVCo, LLC, *EMV Acquirer and Terminal Security Guidelines*, Section 5.4.4, p. 10 (Ver. 1.2) (Apr. 2014).

[17] Form A, Exclusionary Provisions and Associated Cartel Provisions: Application for Authorisation, Public Version, Submission to the Australian Competition and Consumer Commission in support of the Application for Authorisation, Visa Worldwide Pte Limited and Visa AP (Australia) Pty Ltd (collectively, Visa) and Mastercard Asia/Pacific Pte Ltd (Mastercard), at 6 (July 4, 2013).

Purpose Debit Card routing for EMV transactions.  During this time, alternative solutions emerged that would have facilitated merchants' ability, for the first time, to have competitive routing options on all General Purpose Debit Card transactions—including Signature, PIN, PINless, or no-cardholder-verification-method ("no CVM") transactions.  On March 21, 2013, the Secure Remote Payments Council ("SRPc"), a cross-industry trade association with members including a consortium of ten PIN Debit Card networks[18] which later organized the Debit Network Alliance ("DNA"), announced that it intended to select Discover Financial Services ("Discover") "D-PAS" EMV technology to route domestic U.S. General Purpose Debit Card transactions (Signature, PIN, PINless, or no CVM).  This solution used a single common "application identifier" ("AID"), which is software on the chip that identifies available networks over which to route transactions, to facilitate merchant routing.  The proposed single, common AID would have given merchants the ability to route to all payment networks, including Visa and Mastercard, or to competing, cheaper networks.  Discover would license the technology royalty-free, and the DNA intended to create an open architecture, not owned or controlled by any network, to enable compliance with the Durbin Amendment requirements.  This approach and other contemplated single-AID solutions—including an open-source common payment application or opening Visa's and Mastercard's Global AIDs for use by all debit networks—would have ensured that no single network would exercise control over how EMV technology is implemented to allow merchant control of routing to comply with the Durbin Amendment.  That outcome would have protected merchant control over routing, stimulating, for the first time, competition among General Purpose Debit Card networks for all General Purpose Debit Card transactions—Signature, PIN, PINless, and no CVM.

---

[18] Debit Network Alliance members include AFFN, ATH, CO-OP Financial Services, Jeanie, NETS, NYCE, Presto!, PULSE, SHAZAM, and STAR.

147.     Visa set out to block this initiative because of the clear threat it posed to Visa's monopoly power in the market for General Purpose Debit Card Network Services.  Visa initially tried to persuade the DNA's members to use Visa's proprietary technology instead of D-PAS, overtures the members rejected.  After that, Visa embarked on a strategy to block the DNA's plan for an open architecture, make Visa's proprietary EMV technology the market standard, and then exploit that technology to undermine routing to Visa's General Purpose Debit Card Network competitors.

148.     Visa was aware that Mastercard had also tried to persuade the DNA's members to implement Mastercard's technology during this time frame.  Had Mastercard succeeded in doing that, the threat the DNA posed to Visa would have been magnified considerably because a Mastercard/DNA agreement could have aligned all of the General Purpose Debit Card networks, except Visa, under a common, single-AID strategy.  So Visa set out to persuade Mastercard to align with Visa's strategy.

149.     Visa's effort culminated in the two networks agreeing to a common strategy to neutralize the DNA and its efforts to create an open architecture.  Mastercard agreed to this strategy because, given its weaker position in the market, it thought it was better off as the second, unaffiliated network on Visa General Purpose Debit Cards, which would enable Mastercard to gain most (if not all) of the General Purpose Debit Card transactions that were not routed to Visa on those cards—the vast majority of General Purpose Debit Cards in the marketplace.  In exchange, Mastercard agreed to refrain from competing with Visa for Signature Debit routing, and Visa agreed to do the same with respect to Signature Debit transactions on Mastercard General Purpose Debit Cards.

150.    This anticompetitive agreement was formalized in July 2013, when Visa and Mastercard entered into a reciprocal cross-licensing agreement to propagate one another's proprietary EMV technology.  This agreement accomplished two anticompetitive objectives for Visa (and Mastercard).

151.    First, it enshrined their agreement to support a dual-AID strategy where all Visa- and Mastercard-branded General Purpose Debit Cards—in combination, the vast majority of the market—would have two AIDs for domestic General Purpose Debit Card transactions instead of just one.  Under this strategy, all Visa (and Mastercard) General Purpose Debit Cards would have a Global AID (a Visa or Mastercard AID), through which the only routing option available would be Visa (or Mastercard), and which, in the case of Visa, would have presumptive priority under Visa's rules.  Visa (and Mastercard) General Purpose Debit Cards also would have a second "Common AID" which, unlike the Global AID, would give merchants competitive routing options through other networks.

152.    Second, Visa and Mastercard had, in effect, agreed not to compete for Signature Debit routing on EMV debit cards issued over the other's network.  Visa had persuaded Mastercard to join its strategy to protect the linchpin of its monopoly power, Signature Debit.  Both Visa and Mastercard now endorsed a dual-AID strategy that included one option, the Global AID, which could only be routed to Visa (or Mastercard).  And both now endorsed limiting verification methods for debit transactions on the Common AID, the only option that enabled competition for merchant routing.

153.    Following this agreement, Visa (and Mastercard) could present Issuers, who were increasingly concerned about the impending (and artificial) October 2015 liability-shift deadline, with a complete "solution" for enabling compliance with the Durbin Amendment's routing

requirements. Moreover, Visa used the impending deadline to persuade Issuers to force the competing PIN Debit Card networks to drop their open-architecture initiative and accede to Visa's strategy instead. Specifically, Visa encouraged Issuers to tell Visa's competitors that if those networks did not accede to Visa's strategy, then the Issuers would drop them from their General Purpose Debit Cards. By mid-2014, this succeeded completely when all of the competing networks were forced, under pressure from Issuers, to accede to Visa's strategy by licensing Visa's (and Mastercard's) proprietary dual-AID technology.

154. With the dual-AID strategy in place, the competing DNA open architecture suppressed, and the artificial October 2015 liability-shift deadline looming, Visa was able to exploit the dual-AID construct to maintain its monopoly power in two ways. First, because the Global AID would be exclusive to Visa, Visa could use its rules to require the prioritization of that AID to protect its monopoly. While that priority could be overridden by merchants, the process of doing so is cumbersome and costly, guaranteeing that only a handful of the largest merchants would undertake the requisite expenditures. Second, with two AIDs, Visa could exploit its rules and market dominance to ensure that merchants and consumers who would otherwise prefer safer PIN Debit Card transactions would instead make Visa's Global AID available (merchants) and select it (consumers). None of this would have been possible without the implementation of Visa's proprietary technology to propel a dual-AID mechanism for merchant routing.

155. With its technology in place as the industry standard, Visa employed its Honor All Cards and "cardholder selection" rules[19] to force merchants to give cardholders the ability to select the Global AID, which enables the fraud-prone Visa Signature Debit product, thereby exposing

---

[19] *See, e.g.*, Visa Rules 1.5.4.1 (Accepting Visa Products for Payment), 1.5.4.2 (Honoring All Visa Cards), 1.5.4.3 (Honor All Cards (Updated)), 1.5.4.5 (Honor All Cards – US Region), 1.5.4.6 (Selection of Payment System – US Region), 1.5.4.7 (Limited Acceptance Merchant Requirements – US Region), *Visa Core Rules and Visa Product and Service Rules* (Apr. 16, 2016).

consumers to fraud.  Visa is doing this in defiance of federal law, which gives merchants the right to require the Common AID, the only AID that gives merchants the ability to route to competing networks.  Visa justified (and continues to justify) this by asserting that it protects "consumer choice."  But consumers are indifferent to the network over which a General Purpose Debit Card transaction is routed and gain no value from choosing one AID (or one General Purpose Debit Card network) over another.  Yet, Visa has unlawfully used monopoly power to force merchants—including Walmart and Kroger, the two largest merchants in the country—to offer such a "choice" in order to protect that monopoly power.

156.    Moreover, Visa compelled terminal manufacturers to provide off-the-shelf point-of-sale terminals that display "VISA DEBIT" and "US DEBIT" screen prompts when a Visa debit card is inserted.  The screens prompt cardholders to select either "VISA DEBIT" (which represents the Visa Global AID, guaranteeing the transaction will be routed to Visa) or the generic "US DEBIT" (the Common AID that enables routing options to the competing PIN Debit Card networks).  Virtually all cardholders have no idea what "US DEBIT" is (there is no network of that name), and, thus, they invariably select "VISA DEBIT," which routes the transaction to Visa.  Only if the cardholder selects the unknown and deceptively labeled "US DEBIT" does Visa allow the merchant the opportunity to route the transaction to another General Purpose Debit Card network.  Numerous merchants, in the haste forced upon them by Visa (and Mastercard) to implement EMV technology in order to avoid chargeback liability, unwittingly implemented these screens, and more merchants do so to this day.  When these screens are implemented, the vast majority of consumers are tricked into selecting "VISA DEBIT" when they otherwise would have entered their PIN to make a PIN Debit transaction that could have been routed to Visa's competitors.  While merchants can remove these screens, that process is intentionally cumbersome

and costly to make it hard for merchants to do so, once again guaranteeing that only the largest merchants will undertake the requisite investments to do so. For most merchants, the routing will default to Visa. And even if merchants unwind the screens, Visa contends that its rules require the implementation of an alternative prompt that gives the consumer the ability to select between the Global AID, where Visa is the sole routing choice, and the Common AID, where the merchant can enjoy the benefits of competition.

157.    The Federal Reserve recently reaffirmed that Visa's exploitation of EMV to subvert debit transaction routing violates federal law. In response to the proliferation of Visa's strategy, on November 2, 2016, the Federal Reserve announced that "[a] payment card network inhibits a merchant's ability to route electronic debit card transactions if it, by network rules, standards, specifications, contractual agreements, or otherwise, requires the merchant to allow the cardholder to make the choice of EMV chip application on a debit card, where one application routes only to a single network." The Federal Reserve made clear that such "inhibition" of a merchants ability to route violates federal law. Yet, as discussed above, Visa is engaging in such "inhibition" through its network rules and its control over EMV standards and specifications.[20]

---

[20] The text of the Federal Reserve's guidance is as follows: "Q4. After a debit card with an EMV chip is inserted into a point-of-sale terminal, some terminals prompt the cardholder to choose between applications, one that routes to at least two unaffiliated networks and another that routes to a single network. Does a payment card network comply with section 235.7 of Regulation II if it requires the merchant to allow the cardholder to make the choice of EMV chip application, one of which routes only to a single network? A4. No. Section 235.7(b) of Regulation II implements the requirement in section 920(b)(1)(B) of the Electronic Fund Transfer Act that a "payment card network shall not, directly or through any agent, processor, or licensed member of the network, by contract, requirement, condition, penalty, or otherwise, inhibit the ability of any person that accepts or honors debit cards for payments to direct the routing of electronic debit transactions for processing over any payment card network that may process such transactions." A payment card network inhibits a merchant's ability to route electronic debit card transactions if it, by network rules, standards, specifications, contractual agreements, or otherwise, requires the merchant to allow the cardholder to make the choice of EMV chip application on a debit card, where one application routes only to a single network. Such a requirement is not compliant with section 235.7 of Regulation II because it prevents the merchant from directing the routing of electronic debit transactions. (Added November 2, 2016)" Frequently Asked Questions About Regulation II (Debit Card Interchange Fees and Routing), *available at* http://www.federalreserve.gov/paymentsystems/regii-faqs.htm.

158.    Visa also is extending this strategy to mobile payments.  Visa has taken the position that it will not allow merchants to route to competing debit networks for "in-app" purchases, which represent the vast majority of mobile payments transactions.  Visa also is refusing to permit routing competition for transactions authenticated via biometrics, which includes Apple Pay, Apple's digital wallet platform.  Visa has been plotting to block competition on mobile transactions since at least August 2012.

159.    Visa's monopolization of mobile transactions represents a dire threat to the viability of competition in the relevant market.  Visa (and Mastercard) pushed EMV technology because, among other things, it also enables them to dominate mobile payments.  Virtually all EMV readers also contain the NFC or "Near Field Communication" technology that Visa and Mastercard have preferred as the solution to facilitating contactless mobile payments.  As a result, many observers believe that Visa's strategy is to move quickly past EMV—which slows down the point of sale to the annoyance of both merchants and their customers—to contactless payments via mobile devices utilizing NFC terminals that merchants were forced to implement as a result of the EMV liability shift.  As NFC deployment increases, the universe of mobile transactions will increase dramatically as will the foreclosure effects of Visa's blatantly anticompetitive conduct, including in new and emerging areas of potential competition.

160.    At the same time, Visa has also acted to protect its dominance from potential new competitors that were contemplating using their digital wallet platforms to compete with Visa or its Issuers.  Visa's actions were designed to prevent the technology firms that offer digital wallets from configuring their wallets as so-called staged wallets or to leverage the ACH network—the electronic network that directly links to all bank accounts that could readily substitute for Visa's General Purpose Debit Card Networks.

161.    The end results of Visa's post-Durbin strategy have been:  (1) massive foreclosure of competing PIN Debit Card networks, which threatens those networks' viability as EMV continues its U.S. roll-out, and threatens the availability of lower-cost routing options for merchants and safer transactions for consumers; and (2) the continued frustration of the Durbin Amendment's intended objective:  the stimulation of real competition to Visa's monopoly in this market.  Now more than four years after the implementation of the Durbin Amendment's routing rules, Visa still maintains a dominant 55% share of the General Purpose Debit Card market, and close to 75% of the Signature Debit segment.  That it has managed to do so, through the industry migration to EMV and with mobile payments taking shape as a potential alternative, is a remarkable testament to Visa's enduring monopoly power and the relentless strategy it has employed to unlawfully maintain that power.

### 3.    Visa has maintained its monopoly power in the General Purpose Debit Card market

162.    As a result of its conduct, Visa has maintained its monopoly power throughout the Damages Period.  Its share of the General Purpose Debit Card market remains at monopolistic levels and is poised to increase as EMV is rolled out by merchants and mobile payments start to increase, and the Interchange Fees paid to Issuers remain at supracompetitive levels notwithstanding the Durbin Amendment.  Visa's ability to impose supracompetitive and economically unjustified fixed network access fees further reflects its continuing monopoly power.  Visa's ability to dominate the market with the inferior fraud-prone Signature Debit product, which exposes consumers to unnecessary fraud, and to maintain the dominance of that product through the industry migration to EMV, also reflects its continuing monopoly power.

163.    Visa's monopoly power in the General Purpose Debit Card market is protected by high barriers to entry.  To be a viable payment network competitor, a potential entrant would need

both (1) widespread, if not ubiquitous, merchant acceptance and (2) large-scale distribution to consumers through Issuers. While each poses a formidable barrier in its own right, the economic reality is that a new entrant must clear both barriers simultaneously. Merchants are generally unwilling to accept a payment card brand that is carried by few cardholders, and cardholders are generally unwilling to carry a payment card brand that is not widely accepted by merchants. Therefore, starting a new network, whether debit or credit, with sufficient scale to challenge Visa or Mastercard is extremely difficult. These high barriers to entry, coupled with the entrenched dominance of Visa and Mastercard, explain in large part why no meaningful entry has occurred in the General Purpose Credit Card and Debit Card markets since Discover entered three decades ago in 1985.

164.    The Antitrust Division highlighted this structural barrier to entry in the context of the General Purpose Credit Card market in its Competitive Impact Statement relating to the Proposed Final Judgment as to Visa and Mastercard in *United States v. American Express Company*, No. 10-cv-4496-NGG-RER (E.D.N.Y. Oct. 4, 2010), ECF No. 5, at 7:

> *Significant barriers to entry and expansion protect Defendants' market power, and have contributed to Defendants' ability to maintain high prices for years without threat of price competition by new entry or expansion in the market. Barriers to entry and expansion include the prohibitive cost of establishing a physical network over which General Purpose Card transactions can run, developing a widely recognized brand, and establishing a base of merchants and a base of cardholders. Defendants, which achieved these necessities early in the history of the industry, hold substantial early-mover advantages over prospective subsequent entrants. Successful entry today would be difficult, time consuming, and expensive.*

165.    As direct consequences of Visa's anticompetitive conduct which has maintained its debit monopoly, merchants, including Great Wolf and Hastings, have incurred damages throughout the Damages Period in the form of: (1) supracompetitive Interchange Fees on both

PIN Debit Card and Signature Debit Card transactions; (2) supracompetitive network fees, including but not limited to the FANF; (3) substantial and unnecessary expenses in migrating their payment systems to EMV technology; and (4) chargebacks imposed for payment fraud, which would not have been imposed but for Visa's anticompetitive conduct. Consumers have also been harmed because they have been forced to absorb the costs of supracompetitive Interchange Fees and network fees in the form of higher retail prices, and they have suffered increased fraud due to Visa's monopolization of the market with the fraud-prone Signature Debit product as the cornerstone of its strategy.

### ANTITRUST INJURY

166.    Defendants' price-fixing cartels and Visa's monopolistic conduct have caused substantial and ongoing anticompetitive harm to merchants as direct purchasers of General Purpose Payment Card Network Services, in the form of inflated Interchange Fees paid directly by those merchants, foreclosure of network competitors, and reduced output. Nor have Defendants' inflated Interchange Fees for rewards cards resulted in incremental sales at merchants, as Defendants have claimed. To the contrary, rewards cards have harmed merchants because they incent consumers to use higher-priced rewards cards when consumers would otherwise have spent the same amount using lower-cost credit cards. Merchants and their customers have borne—and continue to bear—the brunt of hundreds of billions of dollars of supracompetitive fees and severely decreased consumer welfare.

167.    Defendants' price-fixing cartels have also caused substantial and ongoing anticompetitive harm to cardholders in the form of reduced choices and innovation, higher prices, reduced output, and increased payment fraud. Visa's monopolistic conduct has exacerbated that consumer injury through increased fraud and higher costs that are borne by consumers. Contrary to Defendants' claims that supracompetitive Interchange Fees are justified by cardholder rewards

programs, those programs would continue to exist in the absence of Defendants' unlawful price fixing and agreement not to compete for merchant acceptance. Moreover, Issuers' competition for merchant agreements would create cardholder rewards and discounts beyond those offered by Issuers today. Defendants' foreclosure of that competition has therefore harmed cardholders.

168. Great Wolf and Hastings have suffered direct antitrust injury from Defendants' conduct in violation of the antitrust laws set out above. Throughout the Damages Period, Great Wolf and Hastings directly paid the applicable Interchange Fees to the relevant Issuer with respect to transactions in which Great Wolf and/or Hastings accepted a Visa or Mastercard General Purpose Payment Card as a method of payment. As a result, Great Wolf and/or Hastings paid (and continues to pay) substantial, unlawful overcharges as a direct result of the agreement not to compete, price fixing, and monopolization set out in this Complaint. Great Wolf and Hastings were (and continue to be) deprived of the benefits of competition limited by this conduct in the relevant markets.

169. Because the supracompetitive Interchange Fees that Great Wolf and/or Hastings had to pay were a substantial cost of doing business, Great Wolf and/or Hastings were forced to raise prices paid by their customers or to reduce services provided to their customers as a means of offsetting these Interchange Fees. As a result, sales were below what they would have been, which reduced output and thereby harmed the economy. Moreover, as evidenced by the impact on merchant acceptance of the mandated Interchange Fee reductions in Australia and Europe, inflated Interchange Fees also artificially reduce merchant acceptance of General Purpose Payment Cards. These reductions in retail sales and merchant acceptance, coupled with the limitations on competition from other networks resulting from Defendants' anticompetitive conduct, significantly reduced output below what it would have been. By imposing a massive and hidden

tax on both merchants and consumers, Defendants' conduct decreased consumer welfare and imposed substantial anticompetitive harm.

170.    Moreover, because of the conduct detailed in this Complaint, Great Wolf and/or Hastings could not limit these higher prices to customers using the General Purpose Payment Cards that generated the underlying Interchange Fees.  All customers, including less affluent ones who are more likely to pay with cash, had to bear the cost of these inflated Interchange Fees in the form of higher retail prices or reduced retail services.

171.    Further, the imposition of supracompetitive Interchange Fees distorted Issuer incentives in both markets, resulting in decreased choices for cardholders and the perpetuation of the fraud-prone magnetic-stripe system in the United States.  This diminution of quality and innovation for cardholders is a further harm to competition.

## **RELEVANT MARKETS**

172.    Merchants' demand for General Purpose Payment Card Network Services (authorization, clearance, and settlement of transactions for which a merchant accepts a General Purpose Payment Card) derives from consumer demand for using General Purpose Payment Cards to pay for goods and services.  Accordingly, because consumer demand establishes both a distinct General Purpose Credit Card market as well as a General Purpose Debit Card market, there are corresponding markets, based upon derived merchant demand, for General Purpose Credit Card Network Services and General Purpose Debit Card Network Services to merchants.

173.    The distinct General Purpose Credit Card and General Purpose Debit Card markets encompass products and services provided by Issuers in both markets to cardholders.  In the General Purpose Credit Card market, Issuers compete for cardholders by offering them various services, including rewards, and through fees and charges such as annual fees and interest rates. In the General Purpose Debit Card market, Issuers compete for cardholders by  offering them a

bundle of services, which includes but is not limited to the General Purpose Debit Card, connected to the underlying asset account. Consumers' demand for General Purpose Credit Cards and General Purpose Debit Cards also depends, in part, on merchant demand for accepting such cards. As a result, competition by Issuers for merchant acceptance and point-of-sale differentiation would have been a material feature of these markets in the absence of the conspiracies set forth in this Complaint.

174.    In the alternative, the relevant General Purpose Payment Card Network Services market encompasses the provision of network services to merchants, whose demand is derived from consumer demand, and the provision of network services to Issuers that compete for cardholders based on, among other things, merchant acceptance. The interrelationship between merchant and cardholder demand for General Purpose Credit Cards and General Purpose Debit Cards, respectively, creates distinct network services markets encompassing both merchant and Issuer/cardholder demand for those products. All references to relevant markets in the claims for relief set forth below are based on network services markets encompassing both merchant and Issuer/cardholder demand for General Purpose Credit Cards and General Purpose Debit Cards, respectively.

### A.    There Are Distinct Markets for General Purpose Credit Card Network Services and General Purpose Debit Card Network Services

#### 1.    General Purpose Credit Card Network Services

175.    There were relevant product markets for General Purpose Credit Cards and General Purpose Credit Card Network Services throughout the Damages Period. The existence of these markets has been confirmed by economic analysis of cross-elasticity of demand, by industry and public recognition, and by recent judicial decisions in cases related to the claims asserted in this Complaint. These markets continue to be relevant product markets to this day.

176.    General Purpose Credit Cards allow a consumer to purchase goods and services by accessing a line of credit extended to the cardholder by the Issuer that issued the card.  These cards provided (and still provide) consumers deferred payment and, typically, the opportunity to revolve balances over time.  Charge Cards are a subset of General Purpose Credit Cards that require the consumer to pay off the balance owed upon receipt of their statement, usually monthly.

177.    From the consumer perspective, there are no close substitutes for General Purpose Credit Cards because other forms of payment do not offer comparable credit facilities.  Therefore, General Purpose Credit Cards are better suited for large purchases that a consumer needs to finance over time than are payment methods such as cash, checks, and General Purpose Debit Cards that do not allow deferred payment.  This feature is reflected in studies of consumer payment patterns, which show that the average transaction size for General Purpose Credit Card transactions consistently has significantly exceeded the average ticket for General Purpose Debit Card transactions since the mid-1990s.

178.    In *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d at 336, the court held that "consumers . . . do not consider debit cards to be substitutes for general purpose [credit] cards." The court also found that Issuers "do not view cash or checks as 'competitive' with general purpose [credit] cards."  *Id.*  Most consumers do not want to carry large sums of cash to make large purchases, and checks do not match the acceptance of General Purpose Credit Cards.

179.    Thus, General Purpose Credit Cards have a unique bundle of characteristics that consumers find useful for certain types of transactions, and for which other payment methods are not close substitutes.  A market-wide increase in cardholder fees would not cause sufficient decline in usage for the price increase to be unprofitable to Issuers; demand is sufficiently inelastic to

establish a market for General Purpose Credit Cards.  This was the case throughout the Damages Period.

180.    As the court held in *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d at 336, "it is highly unlikely that there would be enough cardholder switching away from credit and charge cards to make any such [hypothetical] price increase unprofitable for a hypothetical monopolist of general purpose [credit] card products."

181.    Limited purpose proprietary credit cards generally were (and are) accepted only by a single merchant.  Consumers, as a result, did not (and do not) consider proprietary credit cards to be reasonably interchangeable with General Purpose Credit Cards that can be used at numerous merchant locations, as recognized by the court in *United States v. Visa U.S.A. Inc.*  That court held that "[b]ecause proprietary cards, such as a Sear[s'] or Macy's card, are accepted only at a single merchant[,] consumers do not believe that proprietary cards are substitutes for general purpose [credit and T&E] cards and therefore they should not be included in the relevant market."  163 F. Supp. 2d. at 336.  Because of their limited utility, proprietary cards did not (and do not) constrain the prices to merchants for accepting General Purpose Credit Cards.

182.    The events in 2003 following the settlement of the *Visa Check* class action challenging the credit/debit tying rules also support the conclusion that General Purpose Credit Cards and Debit Cards are in separate markets for merchants and cardholders.  The settlements required Visa and Mastercard to untie General Purpose Credit Card and Debit Card acceptance and give merchants the right to choose to accept one product without the other.  Once the settlements went into effect and the tie between General Purpose Credit Card and Debit Card acceptance was broken, Visa and Mastercard increased General Purpose Credit Card Interchange

Fees and reduced Signature Debit Card Interchange Fees. This outcome demonstrates that General Purpose Credit Cards and Debit Cards are in separate markets for merchants and cardholders.

183.    Interchange Fees for both PIN Debit Cards and Signature Debit Cards have decreased since the Federal Reserve promulgated regulations pursuant to the Durbin Amendment, but General Purpose Credit Card Interchange Fees have not decreased in response to reduced General Purpose Debit Card Interchange Fees to merchants. The absence of sensitivity of General Purpose Credit Card Interchange Fees to Interchange Fees for General Purpose Debit Cards is strong economic evidence that General Purpose Credit Cards and Debit Cards are not in the same relevant market for merchants and cardholders.

184.    During the Damages Period, Visa and Mastercard have continued to raise General Purpose Credit Card Interchange Fees, including significant rate increases for Premium Payment Card transactions, and no merchants have stopped accepting Visa and Mastercard General Purpose Credit Card transactions. This shows that merchants continue to believe that a sufficient number of consumers view General Purpose Credit Cards as unique and that merchants must accept them. General Purpose Credit Card Network Services is a well-defined market characterized by an inelasticity of demand and universal recognition by the public, the parties, and the industry as a whole.

### 2.    General Purpose Debit Card Network Services

185.    There were relevant product markets for General Purpose Debit Cards and General Purpose Debit Card Network Services throughout the Damages Period. These markets consisted of both Signature Debit Cards and PIN Debit Cards. The existence of these markets has been confirmed by economic analysis of cross-elasticity of demand, by industry and public recognition, and by recent judicial decisions in cases related to the claims asserted in this Complaint. These markets continue to be relevant product markets to this day. General Purpose Debit Cards permit

consumers to purchase goods and services by directly accessing the consumer's asset account, usually a DDA or checking account.

186.    General Purpose Debit Cards include stored-value cards, such as payroll cards and flexible-spending-account cards, where funds are pre-loaded into an account associated with the card and the cardholder can only spend up to the amount pre-loaded on the card.  Depending on the type of debit card transaction, payment is withdrawn from the cardholder's account and transferred to the merchant within one to several days later.

187.    Both PIN Debit Cards and Signature Debit Cards offer basically the same functionality (albeit with vastly different levels of security) to consumers—a means of payment that is widely accepted and provides for a quick and automatic transfer of funds from the cardholder's asset account (usually a checking account) to the merchant's account.  While the signature and PIN methods of authentication differentiate the products, consumers tend to view them as close substitutes.  Merchants' ability to steer cardholders from Signature Debit Cards to PIN Debit Cards confirms this.

188.    General Purpose Debit Cards possess a combination of characteristics that make them particularly well-suited for certain types of transactions.  Because payments are deducted in a matter of hours (or a few days at most) from a consumer's DDA, General Purpose Debit Cards are strongly differentiated from General Purpose Credit Cards.  Consumers do not consider General Purpose Credit Cards to be an adequate substitute for General Purpose Debit Cards.  Consumers tend to use General Purpose Debit Cards for everyday purchases, such as groceries, small household items, and other small-value purchases, especially of non-durable goods.  Many consumers segment their purchases and prefer to put these everyday purchases on their General

Purpose Debit Cards and use their General Purpose Credit Cards for larger-ticket items that are not consumed on a monthly basis.

189.    In *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d at 336-37, the court held that:

> *Consumers . . . do not consider debit cards to be substitutes for general purpose [credit] cards. Due to their relative lack of merchant acceptance, their largely regional scope, and their lack of a credit function, on-line debit cards, which require a [PIN] number, are not adequate substitute[s] for general purpose [credit] cards. Similarly Visa and Mastercard research demonstrates that consumers do not consider off-line debit cards to be an adequate substitute for general purpose [credit] cards. Knowledgeable industry executives agree with these conclusions.*

190.    General Purpose Debit Cards are safer than carrying cash and do not require that a consumer plan ahead (*e.g.*, by withdrawing cash from a bank account in order to make purchases). As Visa and Mastercard have acknowledged, General Purpose Debit Cards also are more widely accepted than checks, making them suitable for transactions at many merchants where checks are not an option. Consumers view General Purpose Debit Cards as superior to cash and checks and, thus, they likely would not switch to cash and checks in response to a small but significant, non-transitory price increase. Cash and checks also are not reasonably interchangeable with General Purpose Debit Card Network Services for merchants. As the price of PIN Debit Card acceptance increased from a negative price (*i.e.*, merchants were paid to accept debit because it saved banks' check and cash processing costs) to zero (at-par) to the supracompetitive levels of today, merchants did not substitute away from debit.

191.    Merchant demand exists separately for General Purpose Credit Card Network Services and General Purpose Debit Card Network Services. As noted by the court in the *In re Visa Check/MasterMoney Antitrust Litigation*, No. 96-cv-5238(JG), 2003 WL 1712568, at *2 (E.D.N.Y. Apr. 1, 2003), "[o]verwhelming evidence establishes that merchant demand for credit card [network] services is distinct from merchant demand for debit card network services."

"[D]ebit card [network] services is a well-defined submarket characterized by an inelasticity of demand and universal recognition by the public, the parties, and the industry as a whole." *Visa Check*, 2003 WL 1712568, at *7.

### B. The Geographic Market for All Relevant Product Markets Is the United States

192.    The geographic market for all relevant product markets was the United States throughout the Damages Period, and that continues to be the case to this day. Many of Visa's and Mastercard's rules regarding General Purpose Credit Card and General Purpose Debit Card transactions applied only to the U.S. market. Visa and Mastercard also set policies and pricing—including Interchange Fees—separately for the United States from other regions. Additionally, U.S. consumers would not find General Purpose Credit Cards or General Purpose Debit Cards issued in other countries—and therefore other currencies—to be adequate substitutes for General Purpose Credit Cards or General Purpose Debit Cards issued by U.S. banks. Defendants also have demonstrated that small but significant, non-transitory increases in prices limited to these product markets in the United States have been profitable and have not caused merchants or cardholders to turn to other services sufficiently to make these price increases unprofitable.

## <u>FIRST CLAIM FOR RELIEF</u>

### Against the Visa Defendants for Horizontal Price Fixing and Horizontal Agreements Not to Compete in the Market for General Purpose Credit Card Network Services

193.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs, with the same force and effect as if set forth here in full.

194.    The Visa Defendants' agreement not to compete and price-fixing schemes constitute anticompetitive horizontal restraints on competition.

195.    The Visa Defendants maintained the conspiracy for Visa General Purpose Credit Card transactions throughout the Damages Period.

196.    This conspiracy anticompetitively increased, and maintained, the Interchange Fees that merchants paid to Issuers for Visa General Purpose Credit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses.  These price increases were the products of the agreement among Visa and its owner/member banks that the banks will not compete for merchants' acceptance of Visa transactions.

197.    This conspiracy harmed cardholders by reducing the choices available to them in the relevant market, by raising prices, and by increasing their exposure to fraud.

198.    The price-fixing conspiracy and agreement not to compete were *per se* violations of Section 1 of the Sherman Act, as amended.  Even if analyzed under a rule of reason, this conspiracy and agreement not to compete were unreasonable restraints of trade in violation of Section 1.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

199.    Rum Point, as Great Wolf's successor in interest, as well as North Side, as Hastings' successor in interest, suffered and continue to suffer antitrust injury from these *per se* unlawful and/or unreasonable restraints of trade.

200.    As a result of these violations of Section 1 of the Sherman Act throughout the Damages Period, Rum Point, as Great Wolf's successor in interest, and North Side, as Hastings' successor in interest, were, and continue to be, injured in their business and property in an amount not presently known with precision.

## SECOND CLAIM FOR RELIEF

**Against the Visa Defendants for Horizontal Price Fixing and
Horizontal Agreements Not to Compete in the Market for
General Purpose Debit Card Network Services**

201.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs, with the same force and effect as if set forth here in full.

202.    The Visa Defendants' agreement not to compete and price-fixing schemes constitute anticompetitive horizontal restraints on competition.

203.    The Visa Defendants maintained the conspiracy for Visa General Purpose Debit Card transactions throughout the Damages Period.

204.    This conspiracy anticompetitively increased, and maintained, the Interchange Fees that merchants paid to Issuers for Visa General Purpose Debit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses.  These price increases were the products of the agreement among Visa and its owner/member banks that the banks will not compete for merchants' acceptance of Visa transactions.

205.    This conspiracy harmed cardholders by reducing the choices available to them in the relevant market, by raising prices, and by increasing their exposure to fraud.

206.     The price-fixing conspiracy and agreement not to compete were *per se* violations of Section 1 of the Sherman Act, as amended.  Even if analyzed under a rule of reason, this conspiracy and agreement not to compete were unreasonable restraints of trade in violation of Section 1.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

207.    Rum Point, as Great Wolf's successor in interest, and North Side, as Hastings' successor in interest, suffered and continue to suffer antitrust injury from these *per se* unlawful and/or unreasonable restraints of trade.

208.    As a result of these violations of Section 1 of the Sherman Act throughout the Damages Period, Rum Point, as Great Wolf's successor in interest, and North Side, as Hastings' successor in interest, were, and continue to be, injured in their business and property in an amount not presently known with precision.

### THIRD CLAIM FOR RELIEF

**Against the Mastercard Defendants for Horizontal Price Fixing and
Horizontal Agreements Not to Compete in the Market for
General Purpose Credit Card Network Services**

209.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs, with the same force and effect as if set forth here in full.

210.    The Mastercard Defendants' agreement not to compete and price-fixing schemes constitute anticompetitive horizontal restraints on competition.

211.    The Mastercard Defendants maintained the conspiracy for Mastercard General Purpose Credit Card transactions throughout the Damages Period.

212.    This conspiracy anticompetitively increased, and maintained, the Interchange Fees that merchants paid to Issuers for Mastercard General Purpose Credit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses.  These price increases were the products of the agreement among Mastercard and its owner/member banks that the banks will not compete for merchants' acceptance of Mastercard transactions.

213.    This conspiracy harmed cardholders by reducing the choices available to them in the relevant market, by raising prices, and by increasing their exposure to fraud.

214.    The price-fixing conspiracy and agreement not to compete were *per se* violations of Section 1 of the Sherman Act, as amended.  Even if analyzed under a rule of reason, this conspiracy and agreement not to compete were unreasonable restraints of trade in violation of Section 1.  This

scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

215.    Rum Point, as Great Wolf's successor in interest, and North Side, as Hastings' successor in interest, suffered and continue to suffer antitrust injury from these *per se* unlawful and/or unreasonable restraints of trade.

216.    As a result of these violations of Section 1 of the Sherman Act throughout the Damages Period, Rum Point, as Great Wolf's successor in interest, and North Side, as Hastings' successor in interest, were, and continue to be, injured in their business and property in an amount not presently known with precision.

### FOURTH CLAIM FOR RELIEF

**Against the Mastercard Defendants for Horizontal Price Fixing and
Horizontal Agreements Not to Compete in the Market for
General Purpose Debit Card Network Services**

217.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs, with the same force and effect as if set forth here in full.

218.    The Mastercard Defendants' agreement not to compete and price-fixing schemes constitute anticompetitive horizontal restraints on competition.

219.    The Mastercard Defendants maintained the conspiracy for Mastercard General Purpose Debit Card transactions throughout the Damages Period.

220.    This conspiracy anticompetitively increased, and maintained, the Interchange Fees that merchants paid to Issuers for Mastercard General Purpose Debit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses.  These price increases were the products of the agreement among Mastercard and its owner/member banks that the banks will not compete for merchants' acceptance of Mastercard transactions.

221.    This conspiracy harmed cardholders by reducing the choices available to them in the relevant market, by raising prices, and by increasing their exposure to fraud.

222.    The price-fixing conspiracy and agreement not to compete were *per se* violations of Section 1 of the Sherman Act, as amended.  Even if analyzed under a rule of reason, this conspiracy and agreement not to compete were unreasonable restraints of trade in violation of Section 1.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

223.    Rum Point, as Great Wolf's successor in interest, and North Side, as Hastings' successor in interest, suffered and continue to suffer antitrust injury from these *per se* unlawful and/or unreasonable restraints of trade.

224.    As a result of these violations of Section 1 of the Sherman Act throughout the Damages Period, Rum Point, as Great Wolf's successor in interest, and North Side, as Hastings' successor in interest, were, and continue to be, injured in their business and property in an amount not presently known with precision.

## FIFTH CLAIM FOR RELIEF

### Against the Visa Defendants for Vertical Price Restraints in the Market for General Purpose Credit Card Network Services

225.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs, with the same force and effect as if set forth here in full.

226.    The Visa Defendants' price-fixing schemes and anti-steering rules constitute unreasonable and anticompetitive vertical restraints.

227.    Visa entered into an express vertical agreement with each of Visa's owner/member banks, binding all of them to comply with the rules and regulations adopted by Visa, including the default Interchange Fee, Honor All Issuers, and anti-steering rules.  In turn, Visa acted as the

enforcement agent for its rules and regulations and held issuing and acquiring members responsible for compliance with these rules and regulations. These agreements continued in full effect throughout the Damages Period.

228. These vertical price restraints imposed supracompetitive Interchange Fees on merchants for Visa General Purpose Credit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses. These restraints also harmed cardholders by reducing the choices available to them in the relevant market, by raising prices, and by increasing their exposure to fraud.

229. These restraints continued in full effect throughout the Damages Period and constituted unreasonable restraints of trade in violation of Section 1 of the Sherman Act. This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

230. Rum Point, as Great Wolf's successor in interest, and North Side, as Hastings' successor in interest, suffered and continue to suffer antitrust injury from these unreasonable restraints of trade.

231. As a result of this violation of Section 1 of the Sherman Act throughout the Damages Period, Rum Point, as Great Wolf's successor in interest, and North Side, as Hastings' successor in interest, were, and continue to be, injured in their business and property in an amount not presently known with precision.

## SIXTH CLAIM FOR RELIEF

### Against the Visa Defendants for Vertical Price Restraints in the Market for General Purpose Debit Card Network Services

232. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs, with the same force and effect as if set forth here in full.

233.    The Visa Defendants' price-fixing schemes and anti-steering rules constitute unreasonable and anticompetitive vertical restraints.

234.    Visa entered into an express vertical agreement with each of Visa's owner/member banks, binding all of them to comply with the rules and regulations adopted by Visa, including the default Interchange Fee, Honor All Issuers, and anti-steering rules.  In turn, Visa acted as the enforcement agent for its rules and regulations and held issuing and acquiring members responsible for compliance with these rules and regulations.  These agreements continued in full effect throughout the Damages Period.

235.    These vertical price restraints imposed supracompetitive Interchange Fees on merchants for Visa General Purpose Debit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses.  These restraints also harmed cardholders by reducing the choices available to them in the relevant market, by raising prices, and by increasing their exposure to fraud.

236.    These restraints continued in full effect throughout the Damages Period and constituted unreasonable restraints of trade in violation of Section 1 of the Sherman Act.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

237.    Rum Point, as Great Wolf's successor in interest, and North Side, as Hastings' successor in interest, suffered and continue to suffer antitrust injury from these unreasonable restraints of trade.

238.    As a result of this violation of Section 1 of the Sherman Act throughout the Damages Period, Rum Point, as Great Wolf's successor in interest, and North Side, as Hastings'

successor in interest, were, and continue to be, injured in their business and property in an amount not presently known with precision.

### SEVENTH CLAIM FOR RELIEF

**Against the Mastercard Defendants for Vertical Price Restraints
in the Market for General Purpose Credit Card Network Services**

239.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs, with the same force and effect as if set forth here in full.

240.    The Mastercard Defendants' price-fixing schemes and anti-steering rules constitute unreasonable and anticompetitive vertical restraints.

241.    Mastercard entered into an express vertical agreement with each of Mastercard's owner/member banks, binding all of them to comply with the rules and regulations adopted by Mastercard, including the default Interchange Fee, Honor All Issuers, and anti-steering rules.  In turn, Mastercard acted as the enforcement agent for its rules and regulations and held issuing and acquiring members responsible for compliance with these rules and regulations.  These agreements continued in full effect throughout the Damages Period.

242.    These vertical price restraints imposed supracompetitive Interchange Fees on merchants for Mastercard General Purpose Credit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses.  These restraints also harmed cardholders by reducing the choices available to them in the relevant market, by raising prices, and by increasing their exposure to fraud.

243.    These restraints continued in full effect throughout the Damages Period and constituted unreasonable restraints of trade in violation of Section 1 of the Sherman Act.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

244.    Rum Point, as Great Wolf's successor in interest, and North Side, as Hastings' successor in interest, suffered and continue to suffer antitrust injury from these unreasonable restraints of trade.

245.    As a result of this violation of Section 1 of the Sherman Act throughout the Damages Period, Rum Point, as Great Wolf's successor in interest, and North Side, as Hastings' successor in interest, were, and continue to be, injured in their business and property in an amount not presently known with precision.

## EIGHTH CLAIM FOR RELIEF

### Against the Mastercard Defendants for Vertical Price Restraints in the Market for General Purpose Debit Card Network Services

246.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs, with the same force and effect as if set forth here in full.

247.    The Mastercard Defendants' price-fixing schemes and anti-steering rules constitute unreasonable and anticompetitive vertical restraints.

248.    Mastercard entered into an express vertical agreement with each of Mastercard's owner/member banks, binding all of them to comply with the rules and regulations adopted by Mastercard, including the default Interchange Fee, Honor All Issuers, and anti-steering rules.  In turn, Mastercard acted as the enforcement agent for its rules and regulations and held issuing and acquiring members responsible for compliance with these rules and regulations.  These agreements continued in full effect throughout the Damages Period.

249.    These vertical price restraints imposed supracompetitive Interchange Fees on merchants for Mastercard General Purpose Debit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses.  These restraints also harmed

cardholders by reducing the choices available to them in the relevant market, by raising prices, and by increasing their exposure to fraud.

250.    These restraints continued in full effect throughout the Damages Period and constituted unreasonable restraints of trade in violation of Section 1 of the Sherman Act. This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

251.    Rum Point, as Great Wolf's successor in interest, and North Side, as Hastings' successor in interest, suffered and continue to suffer antitrust injury from these unreasonable restraints of trade.

252.    As a result of this violation of Section 1 of the Sherman Act throughout the Damages Period, Rum Point, as Great Wolf's successor in interest, and North Side, as Hastings' successor in interest, were, and continue to be, injured in their business and property in an amount not presently known with precision.

## NINTH CLAIM FOR RELIEF

### Against Visa for Monopolization of the Market for General Purpose Debit Card Network Services

253.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs, with the same force and effect as if set forth here in full.

254.    Through the anticompetitive acts set forth above, Visa has unlawfully acquired monopoly power in the market for General Purpose Debit Card Network Services. Visa has taken acts that have the effect of giving it power over price and the power to exclude competition in the market for General Purpose Debit Card Network Services.

255.    Through the FANF and its exploitation of the industry migration to EMV technology, Visa has further unlawfully maintained its monopoly power through anticompetitive

conduct that had the purpose and effect of excluding competition from, and raising the costs of, other providers of General Purpose Debit Card Network Services.

256.    As a direct and proximate result of Visa's exclusionary conduct, Interchange Fees and network fees for General Purpose Debit Card and Credit Card Network Services were set at artificial, supracompetitive levels and Rum Point, as Great Wolf's successor in interest, and North Side, as Hastings' successor in interest, suffered injury to their business and property by paying such artificially-inflated, supracompetitive Interchange Fees and network fees, along with incurring chargebacks and unnecessary hardware implementation costs. Rum Point, as Great Wolf's successor in interest, and North Side, as Hastings' successor in interest, suffered antitrust injury from these acts of monopolization.

257.    Visa's conduct also has harmed consumers in the relevant market by perpetuating the dominance of the fraud-prone Signature Debit product and by imposing higher costs and prices that are borne by consumers.

258.    Visa's unlawful acquisition of monopoly power constituted a violation of Section 2 of the Sherman Act.  Visa's unlawful maintenance of monopoly constitutes a violation of Section 2 of the Sherman Act, which is ongoing.

## TENTH CLAIM FOR RELIEF

### Against Visa for Attempted Monopolization of the Market for General Purpose Debit Card Network Services

259.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs, with the same force and effect as if set forth here in full.

260.    Visa has taken acts that have the effect of giving Visa power over price and the power to exclude competition in the market for General Purpose Debit Card Network Services.

261.    Visa specifically intended to monopolize the market for General Purpose Debit Card Network Services, as evidenced by its specific intent to obtain power over Interchange Fee and network fee pricing for General Purpose Debit Card Network Services, by its specific intent to exclude competition in the market for General Purpose Debit Card Network Services, and by its specific intent to take acts with the effects of giving Visa power over price and excluding competition.

262.    To the extent it does not already possess monopoly power, there is a dangerous probability that Visa will obtain monopoly power in the market for General Purpose Debit Card Network Services through the FANF and through its exploitation of the industry migration to EMV technology to suppress competition in this market.

263.    As a direct and proximate result of Visa's exclusionary conduct, Interchange Fees and network fees for General Purpose Debit Card Network Services were set at artificial, supracompetitive levels and Rum Point, as Great Wolf's successor in interest,  and North Side, as Hastings' successor in interest, suffered injury to their business and property by paying such artificially-inflated, supracompetitive Interchange Fees, along with incurring chargebacks and unnecessary hardware implementation costs.  Rum Point, as Great Wolf's successor in interest, and North Side, as Hastings' successor in interest, suffered antitrust injury from these attempted acts of monopolization.

264.    Visa's conduct also has harmed consumers in the relevant market by perpetuating the dominance of the fraud-prone Signature Debit product and by imposing higher costs and prices that are borne by consumers.

265.    Visa's attempted monopolization constituted and, through the FANF, continues to constitute a violation of Section 2 of the Sherman Act.

## ELEVENTH CLAIM FOR RELIEF

### Against Visa for Conspiracy to Monopolize the Market
### for General Purpose Debit Card Network Services

266.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs, with the same force and effect as if set forth here in full.

267.    Visa and its owner/member banks combined and conspired among themselves with the specific intent to monopolize the market for General Purpose Debit Card Network Services. Such conspiracy included agreements between Visa and the banks to restrict and foreclose competition from competing PIN debit networks, and the banks' participation in Visa's strategy to exploit EMV to suppress competition in the General Purpose Debit Card Network Services market.

268.    This conspiracy was successful, as Visa, through the overt acts described above, acquired, enhanced, and maintained monopoly power in the market for General Purpose Debit Card Network Services during the Damages Period.

269.    As a direct and proximate result of Visa and the banks' conspiracy to monopolize, Interchange Fees for General Purpose Debit Card Network Services and network fees were set at artificial, supracompetitive levels and Rum Point, as Great Wolf's successor in interest, and North Side, as Hastings' successor in interest, suffered and continue to suffer antitrust injury to their business and property by paying such artificially-inflated, supracompetitive Interchange Fees and network fees, along with incurring chargebacks and unnecessary hardware implementation costs.

270.    Visa's and the banks' conduct also has harmed consumers in the relevant market by perpetuating the dominance of the fraud-prone Signature Debit product and by imposing higher costs and prices that are borne by consumers.

271.    Visa and the banks' conspiracy to monopolize constituted and, through the FANF, continues to constitute a violation of Section 2 of the Sherman Act.

### TWELFTH CLAIM FOR RELIEF

**Against All Defendants for Violation of State
Antitrust and Unfair Competition Laws**

272.    Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs, with the same force and effect as if set forth here in full.

273.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Alabama Code § 8-10-1 et seq.

274.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Arizona Revised Stat. § 44-1401 et seq.

275.     By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of California Bus. & Prof. Code § 16700 et seq. and Cal. Bus. & Prof. Code § 17200 et seq.

276.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of District of Columbia Code § 28-4501 et seq.

277.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Florida Stat. Ann. § 501.201 et seq.

278.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Hawaii Rev. Stat. § 480-1 et seq.

279.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of 740 Illinois Comp. Stat. Ann. § 10/1 et seq.

280.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Iowa Code Ann. § 553.1 et seq.

281.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Kansas Stat. Ann. § 50-101 et seq.

282.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Maine Rev. Stat. Ann. 10, § 1101 et seq.

283.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Michigan Comp. Laws Ann. § 445.771 et seq.

284.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Minnesota Stat. Ann. § 325D.49 et seq.

285.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Mississippi Code Ann. § 75-21-1 et seq.

286.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Nebraska Rev. Stat. § 59-801 et seq.

287.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Nevada Rev. Stat. Ann. § 598A.010 et seq.

288.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of New Mexico Stat. Ann. § 57-1-1 et seq.

289.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of New York General Business Law § 340 et seq. and § 369-A.

290.     By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of North Carolina Gen. Stat. § 75-1 et seq.

291.     By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of North Dakota Cent. Code § 51-08.1-01 et seq.

292.     By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Oregon Rev. Stat. Ann. § 646.705 et seq.

293.     By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Rhode Island Gen. Laws Ann. § 6-36-1 et seq.

294.     By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of South Dakota Codified Laws Ann. § 37-1-3.1 et seq.

295.     By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Tennessee Code Ann. § 47-25-101 et seq.

296.     By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Vermont Stat. Ann. 9 § 2451 et seq.

297.     By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Wisconsin Stat. Ann. § 133.01 et seq.

298.     As a direct and proximate result of Defendants' unlawful conduct, Rum Point, as Great Wolf's successor in interest, and North Side, as Hastings' successor in interest, suffered, and

continue to suffer, injury to their business and property in each of these states by paying such artificially-inflated, supracompetitive Interchange Fees for General Purpose Credit Card Network Services and General Purpose Debit Card Network Services.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully demand:

A.      that the Court declare, adjudge, and decree that Defendants have committed the violations of law alleged herein;

B.      that the Court award damages to Rum Point and North Side, as Great Wolf's and Hastings' respective successors in interest, because of Defendants' misconduct in an amount to be proved at trial and to be trebled in accordance with antitrust law, plus interest (including prejudgment interest), attorneys' fees, and costs of suit;

C.      that the Court enjoin Defendants' enforcement of Visa's and Mastercard's Honor All Issuers, Default Interchange, and anti-steering rules;

D.      that the Court enjoin Visa's FANF;

E.      that the Court enjoin Visa's exploitation of EMV to suppress competition from alternative debit networks, including by enjoining its enforcement of its cardholder selection rules, and by enjoining its strategy to force the industry to implement a dual-AID construct that enables Visa to limit competition from such networks;

F.      that the Court order Visa to comply with federal law and provide merchants routing options on all debit transactions; and that the Court grant such other and further relief as it may deem just and proper.

Dated:  New York, New York
       January 12, 2023

MCKOOL SMITH PC

By:   */s/ John C. Briody*              
          John C. Briody (4231270)
          James H. Smith
          Daniel Hendler
          One Manhattan West, 50th Floor
          New York, New York 10001
          Telephone: (212) 402-9400
          Facsimile:  (212) 402-9444
          jbriody@mckoolsmith.com

          *Attorney for Rum Point Recovery*
          *LLC and North Side Recovery LLC*